# ◻ COPY

## EXCLUSIVE SONGWRITER & CO-PUBLISHING AGREEMENT

THIS Agreement made and entered into as of June 14, 2000, by and between **TVT MUSIC, INC.** (hereinafter referred to as "Publisher"), whose address is 23 East 4th Street, New York NY 10003, and **TUFF JEW PRODUCTIONS LLC, A Pennsylvania Limited Liability Company** (hereinafter referred to as "you"), whose address 326 Bainbridge Street, Philadelphia, PA 19147.

1.      **SERVICES**.  During the "Term" (as hereinafter defined) of this Agreement, you wi. furnish the exclusive services of Scott Storch (hereinafter referred to as "Writer") exclusivel to Publisher to write and deliver to Publisher, for exclusive exploitation hereunder, all of "your interest" in all of the musical compositions written by Writer, in whole or in part, alone or together with others, prior to and during the Term.  Your interest (i.e., that portion attributable to Writer's authorship) in such musical composition(s) shall sometimes be referred to as the "Composition(s)," as more fully described in Paragraph 4 below.  A list of pre-existing musical compositions that are subject to this Agreement is attached hereto as Schedule A and made a part hereof but the failure to list a particular pre-existing Composition on Schedule A shall not detract from Publisher's rights to that Composition under this agreement.

2.      **TERM**.

       (a)      The term of this Agreement (the "Term") will begin on the date specified above and will continue for:

              (i)      An "Initial Period" ending June 30, 2001; and

              (ii)      The additional periods, if any, for which the Term may be extended through Publisher's exercise of the options granted to Publisher below.

       (b)      You grant Publisher two (2) separate options to extend the Term for additional periods (the "Option Periods"), on the same terms and conditions as are applicable for the Initial Period, except as may otherwise be provided in this Agreement.  The Initial Period and the Option Periods are sometimes referred to as the "Contract Periods."  Publisher may exercise each such option by sending you a notice by not later than the expiration date of the Contract Period which is then in effect (the "then Current Contract Period").  If Publisher exercises an option, the Option Period concerned will begin immediately after the end of the then Current Contract Period and will continue until thirty (30) days after you have fulfilled (and Publisher has received written notice from you accurately reflecting the fulfillment of) your "Minimum Delivery and Release Commitment" (as defined in Paragraph 3 below) for that Option Period, but not earlier than one (1) year after the commencement of the Option Period concerned.

       (c)      If Publisher fails to exercise the first such option, the Term will terminate as of the end of the Initial Period, and the second option will lapse, but Publisher shall retain all other rights acquired during the Term.  If Publisher fails to exercise the second such option, the Term will terminate as of the end of the first Option Period but Publisher shall retain all other rights acquired during the Term.  For the avoidance of doubt, if Publisher does not exercise a particular option, the musical compositions written by Writer in the applicable thirty (30) day period referred to in paragraph 2 (b) shall not be deemed Compositions under this Agreement.

703
00

14-00   05:21pm   From-GRUBMAN INDURSKY, SCHINDLER PC          (212)6540428          T-667   P.03   F-273

3.    **MINIMUM DELIVERY AND RELEASE COMMITMENT**.

    (a)    During the Initial Period, there shall be no Minimum Delivery and Release Commitment.

    (b)    During each Option Period, in satisfaction of your "Minimum Delivery and Release Commitment" (also referred to as the "MDRC"), you shall Deliver to Publisher no less than ten (10) "Full New Compositions" (as defined in paragraph 4 below) or the fractional equivalent thereof, which shall be contained on "Albums" (as hereinafter defined) that are "Commercially Released" (as hereinafter defined) during the Option Period and for which no less than the "Compliance Mechanical Rate" (as hereinafter defined) is payable to Publisher. However, no more than two (2) Full New Compositions (or the fractional equivalent thereof on any one (1) Album shall count towards the MDRC in any Option Period unless such Album shall attain "Net Sales" (as hereinafter defined) in the United States of 750,000 units (provided Publisher shall have received mechanical royalties thereon at no less than the Compliance Mechanical Rate).✱

    (c)    You shall Deliver to Publisher all of the New Compositions immediately after creation, but your failure to Deliver same shall not affect Publisher's rights to such Compositions.

    (d)    For the avoidance of doubt, if Publisher receives mechanical royalties at less than the Compliance Mechanical Rate with respect to a New Composition, a pro rata portion of that Composition shall count towards your MDRC as specified in paragraph 4(a)(ii) below.

4.    **COMPOSITION(S)**.    Composition(s) means any musical work, including titles, lyrics, music, musical scores, and the like; all arrangements, adaptations, translations and other versions thereof; and all other works derived from the foregoing.  A musical work that would otherwise be a Composition will not be deemed a Composition unless it is both capable of being copyrighted and is acceptable to Publisher, in its reasonable business judgment, as legally and commercially satisfactory (any Composition that has been Commercially Released shall be deemed commercially satisfactory).

    (a)    "New Composition" -- means that part of any Composition written by Writer during the Term.  No Composition or any arrangement or adaptation thereof may be deemed to be a New Composition more than once during the Term.

        (i)    "Full New Composition" -- means any New Composition written entirely by Writer and not previously Delivered to Publisher, as to which you grant to Publisher an undivided 50% ownership interest in your interest in the Composition, as well as exclusive financial administration thereof (i.e., Publisher shall collect all monies related to the Composition [exclusive of the "songwriter share" of non-dramatic public performances income collected and paid by a performing rights licensing organization]), and as to which Publisher shall receive mechanical royalties at no less than the Compliance Mechanical Rate.

        (ii)    Any New Composition as to which you grant Publisher a lower percentage of ownership interest or less than exclusive financial administration thereof or as to which mechanical royalties are payable at less than the Compliance Mechanical Rate shall apply as a fraction of one (1) Full New Composition as follows for the purposes of determining your compliance with the Minimum Delivery and Release Commitment: (A) if you grant to Publisher less than a 50% ownership interest, such New Composition shall apply as a fraction

✱ For avoidance of doubt, Compositions embodied on the Snoop Doggy Dog, NWA, Busta Rhymes, and Dynasty (J Jay-Z) Albums, shall not count towards your MDRC regardless of the date the subject Album is Commercially Released.

of a New Composition, the numerator of which is the ownership interest percentage granted and the denominator of which is 50%, unless a greater reduction is specified in the next sentence. (B) If you grant to Publisher less than exclusive financial administration, such New Composition shall apply as a fraction of a New Composition, equal to the fraction of financial administration granted to Publisher. (C) If Publisher receives mechanical royalties at less than the Compliance Mechanical Rate, such New Composition shall apply as a fraction of a New Composition, the numerator of which is the actual mechanical royalty paid to Publisher and the denominator of which is the Compliance Mechanical Rate.

(b)     **"Old Compositions"**. The musical compositions written by Writer, in whole or in part, prior to the commencement of the Term, are listed on Schedule A, and are hereinafter called "Old Compositions." Simultaneously with the execution of this Agreement, you shall execute an Assignment of Copyright, in the form annexed hereto as Exhibit A, covering your interest in the copyright to the Compositions listed on Schedule A.

(c)     **"Acquired Compositions"**. That interest in all musical compositions (in addition to the New Compositions and the Old Compositions) in which you and/or Writer acquire(s) any ownership, control or administration interest during the Term are hereinafter called "Acquired Compositions."

(d)     The New Compositions, the Old Compositions and the Acquired Compositions are hereinafter sometimes collectively called the "Compositions."

(e)     For the avoidance of doubt, the musical compositions listed on Schedule B are not Compositions hereunder, and shall be excluded from the terms of this Agreement.

5.     **GRANT OF RIGHTS**.

(a)     **Assignment of Copyrights**. Subject to the terms and conditions hereof (including, without limitation, Paragraphs 5A and 5B below), you hereby sell, transfer and assign to Publisher, its successors and assigns, an undivided 50% interest in all of your interest in the Compositions, including without limitation, the copyrights therein and any and all renewals and/or extensions thereof throughout the Territory, all claims and causes of action related to the Compositions accruing at any time and all other rights of whatsoever nature in the Compositions, including without limitation, the titles, words and music of the Compositions and each and every arrangement, adaptation and version thereof for the full term of copyright protection and all extensions and renewals thereof, in the United States and throughout the Territory. You will execute and deliver to Publisher such instruments of transfer and other documents regarding the rights of Publisher in the Compositions as Publisher may reasonably request to carry out the purposes of this Agreement (including, without limitation, the Exhibits annexed hereto). You hereby retain the remaining 50% share of your interest in the copyright in the Compositions.

(b)     **Administration**. Subject to Paragraph 5A below and the restrictions set forth in subparagraph (c) below, during the Term and the "Retention Period" (as defined below), Publisher and its Licensees will have the sole and exclusive right to administer the Compositions and the copyrights therein, including without limitation, to:

(i)     License, and cause others to license, the exploitation and dissemination of the Compositions, including, without limitation, the right to license: (A) broadcast and other public performances; (B) the manufacture, distribution and sale of Phonograph Records

3

embodying any one or more Compositions; and (C) the synchronization of the Compositions in connection with motion pictures, television programs, commercials and other audiovisual productions, all of the foregoing by any means or methods and in any medium or configuration, utilizing any technology, whether now or hereafter known;

(ii)     Arrange, adapt, translate, print, publish and sell, alone or together with other works, printed editions or other reproductions of the Compositions and/or license other s to do so; translations into languages other than English shall be authorized only on a "work-made-for-hire" basis (subject to any rules and/or regulations of any foreign performance or mechanical rights licensing organizations);

(iii)     Collect all monies earned with respect to the Compositions, including without limitation, all monies earned prior to the date hereof (and not yet collected by you) and all performance royalties payable to you with respect to the Compositions by the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or any other applicable performing rights society (hereinafter collectively the "Societies"), but excluding the so-called "writer's share" of public performance income.

(c)     Notwithstanding anything to the contrary set forth above, Publisher shall not have the right to do any of the following without your prior written consent, which shall not be unreasonably withheld unless otherwise specifically provided (your consent shall be deemed to have been given if Publisher has not heard otherwise from you within ten (10) business days of your receipt of Publisher's notice to you seeking your consent):

(i)     license a Composition for any theatrical motion picture rated "NC-17" or for any television or radio commercial, or for any endorsement of a product or service (your consent may be withheld in your absolute discretion);

(ii)     license a Composition for merchandising activities, grand rights or dramatization rights (your consent may be withheld in your absolute discretion);

(iii)     make or authorize the making of any material changes in the melody or English lyrics of any Composition;

(iv)     license any Composition for top-line full retail price sales at a mechanical rate of less than the Compliance Mechanical Rate;

(v)     exploit any demonstration record commercially.

(vi)     license a third party to include a "sample" of any portion of a Composition in a recording;

(vii)     while we shall always have the right to grant a so-called "first-use" mechanical license, you shall have the right to approve same if such first-use license is issue for a Recording of a Composition that features a recording artist other than: (i) Writer, or (ii) an artist that is produced by you or Writer, unless you or Writer had previously encouraged us to actively seek such Recording.

(viii)     while we shall always have the right to deal with our Affiliates, such dealings shall be on an arms-length basis.

Our inadvertent failure to comply with any of the foregoing shall not be a breach of this Agreement.

## 5A.   RETENTION PERIOD.

Publisher shall retain all rights acquired by it under this Agreement in connection with the Compositions in each country of the Territory until the later of: (i) twelve (12) years following the expiration of the Term; or (ii) the accounting period following the accounting period during which your royalty account is in a fully recouped position (the "Retention Period"); provided, however, that if your royalty account is unrecouped fifteen (15) years following the expiration of the Term, then you shall have the right to repay Publisher 125% of the then-unrecouped balance and the Retention Period shall end at the end of the accounting period following the date of such repayment. The transfer of rights back to you shall be made only after receipt by Publisher of written notice signed by you, requesting such transfer, whereupon all rights assigned to Publisher hereunder, including, but not limited to, all copyrights throughout the Territory, shall be promptly assigned to you. In this connection, Publisher shall execute all appropriate documents reasonably requested by you at such time to evidence said assignment, including, but not limited to, Assignments of Copyright, letters of direction to the applicable performing rights societies, instructions to subpublishers to withdraw all claims and pay through to you 100% of all income received by them after the effective date of such reversion, and a general letter of direction, which you may reasonably request to carry out and effectuate the intent and purposes of this Paragraph. If Publisher fails to execute any such documents within thirty (30) days after your request, you shall have the right to execute such documents on Publisher's behalf as Publisher's attorney in fact; you shall provide Publisher with copies of all such documents executed by you.   Notwithstanding the reversion of such rights, Publisher shall have the right to collect all monies earned during the Term and the Retention Period for a period of twelve (12) months after the end of the Retention Period as to monies earned in the United States, and eighteen (18) months after the end of the Retention Period as to monies earned elsewhere in the Territory (the "Collection Period") and not afterwards.

## 5B.   REVERSION OF UNEXPLOITED COMPOSITIONS

If any Composition has not been "Commercially Exploited" (as defined below) as of the end of the accounting period following the date which is Three (3) years following the expiration of the Term hereof, then you shall have the right, by notice to Publisher no later than Ninety (90) days following such date, to require Publisher to assign to you Publisher's undivided ownership interest in such Unexploited Composition.

For the purposes of this paragraph 5B, the term "Commercially Exploited" shall mean that a Composition: (1) has been recorded and Commercially Released; or (2) has been exploited via synchronization use; or (3) is on "hold" (as that term is customarily used in the publishing business), in which case said Composition shall continue to remain subject to Publisher's rights for an additional one (1) year at which time if said Composition has not then been Commercially Exploited then said Composition shall revert to you in accordance with the terms hereof.

To evidence such reassignment, Publisher shall execute assignment of copyrights reasonably requested and provided by you so long as such documents are satisfactory to Publisher.

6.    **ADVANCES**. During the Term of this Agreement, provided you and Writer have complied with your and Writer's material obligations hereunder, Publisher shall pay to you the following Advances against all royalties accruing and payable to you pursuant to this Agreement:

(a)    During the Initial Period, a minimum of Six Hundred Thousand Dollars ($600,000) and a maximum of One Million Ten Thousand Dollars ($1,010,000), payable as follow :

(i)    $600,000 promptly after the complete execution of this Agreement by all parties; including your Delivery of all Schedules and Exhibits, copyrights assignments and notice letters.

If any mechanical royalties are later discovered to have been collected by you or anyone else on your behalf or on behalf of Writer in connection with the following Albums (or "singles" therefrom), then such amounts shall be deducted from future Advances, royalties and/or other monies payable to you under this Agreement:

    A.    The Dr. Dre Album entitled Dre 2001;
    B.    The Roots Album entitled "Things Fall Apart";
    C.    "The Best Man" Soundtrack Album;
    D.    "The Wood" Soundtrack Album;
    E.    "The Hurricane" Soundtrack Album.

(ii)    The Advances set forth in the chart below shall be paid to you promptly after the Delivery to Publisher of the following: (a) the Commercial Release of the Album by the recording artist in question; (b) confirmation by the applicable Record Company of the actual mechanical royalty rates to be paid to Publisher in connection with the sale and distribution of such Album; and (c) confirmation by the applicable Record Company that there are no advances or other charges recoupable from mechanical royalties payable to Publisher.

| Artist | Mechanical Royalties payable to Publisher ($) | Advance ($) |
| --- | --- | --- |
| Snoop Doggy Dog | .225 + | 150,000 |
|  | .15 - .2249 | 100,000 |
|  | .075 - .149 | 50,000 |
| NWA | .15 + | 90,000 |
|  | .09 + .149 | 60,000 |
|  | .06 - .089 | 40,000 |
|  | .03 - .059 | 20,000 |
| Busta Rhymes | .09 + | 60,000 |
|  | .06 - .089 | 40,000 |
|  | .03 - .059 | 20,000 |
| Dynasty (Jay-Z) | .105 + | 60,000 |
|  | .07 + .1049 | 40,000 |
|  | .035 + .069 | 20,000 |

703
00

6

You shall have the one-time right to substitute another artist for any of the aforementioned Artists if the substitute artist has both (1) the same or better sales history as shown by Soundscan, and (2) the same or better BDS history, as the Artist being replaced. As an alternative, you shall have the one-time right to substitute another artist for any of the aforementioned Artists, but your Advance will be seventy-five percent (75%) of the relevant Advance, if the substitute artist has only the same or better sales history as shown by Soundscan as the Artist being replaced.

   (iii) A so-called "roll-over" Advance of Fifty Thousand Dollars ($50,000) f your royalty account is fully recouped during the Initial Period.

  (b) Option Periods. With respect to each Option Period, if any, for which Publish r exercises its option, Publisher shall pay you an Advance equal to two-thirds (2/3) of the U.S mechanical royalties credited to your royalty account during the first twelve (12) months of t ie immediately preceding Contract Period, subject, however, to the minimum and maximum Advances set forth below (each such Advance, including the minimum and maximum Advances specified below, shall be subject to the further reductions specified in paragraph 6 d) below):

| Option Period | Minimum Advance | Maximum Advance |
|---|---|---|
| First Option | $500,000 | $900,000 |
| Second Option | $650,000 | $1,300,000 |

  Solely for the purposes of this paragraph 6 (b), in computing the amount of mechanical royalties credited to your royalty account, Publisher shall include "pipeline income." For the purposes hereof, the term "pipeline income" shall be defined as two-third (2/3) of mechanical royalties earned in the United States and received by Publisher in the United States in respect of the Compositions as of the date on which the Advance is calculat d which has not been credited to your royalty account.

  If your account is unrecouped at the time the First Option Period Advance is calculat d, then the unrecouped amount shall be deducted from the Advance, but the Advance shall be ( ) less than $300,000 for the First Option Period (subject, however, to the further reductions specified elsewhere in this Agreement).

  (c) The Option Period Advances shall be payable one-half (1/2) promptly followi g the commencement of that Option Period; one-fourth (1/4) promptly following your fulfillm nt of 50% of your MDRC for that Option Period; and the balance upon fulfillment of all of you r MDRC for that Option Period.

  (d) If Publisher makes an overpayment to you in connection with an Advance, or otherwise, Publisher shall have the option to either: (i) require you to reimburse Publisher f r the amount of that overpayment; or (ii) deduct the amount of that overpayment from the Advances and other payments otherwise payable to you for the succeeding Contract Periods.

7. **ROYALTIES**. Publisher shall credit to your royalty account the following royalties with respect to its exploitation of the Compositions throughout the Territory.

  (a) **Public Performance Income**. Fifty percent (50%) of Publisher's "Net Receipts" (as hereinafter defined) derived from the so-called "publisher's share" of public

06-14-00   05:23pm   From-GRUBMAN INDURSKY SCHINDLER PC              12125540429        T-557  P.09/35  F-273

performance income, as licensed by BMI or another performing rights licensing organization or society. If a Society in any part of the Territory does not license any particular public performance use of a Composition, Publisher may license that use directly and credit to your royalty account seventy-five percent (75%) of Publisher's Net Receipts in connection with such license.

   (b)   **Mechanical Income.** (i) Seventy-five percent (75%) of Publisher's Net Receipts derived from the use of Compositions on Records, other than "Cover Recordings"; (ii) Seventy percent (70%) of Publisher's Net Receipts derived from the use of the Compositions on Cover Recordings, and (iii) Sixty-five percent (65%) of Publisher's Net receipts derived from the use of the Compositions on Cover Recordings obtained substantially through Publisher's efforts. For the avoidance of doubt, the lower rates shall apply only to mechanical income derived from the particular Cover Recording only, and not on the original Recording

   (c)   **Synchronization Income.** (i) Seventy percent (70%) of Publisher's Net Receipts derived from synchronization licenses, and (ii) Sixty-five percent (65%) of Publisher's Net receipts derived from synchronization licenses obtained substantially through Publisher's efforts.

   (d)   **Print Income.** Seventy-five percent (75%) of Publisher's Net Receipts derived from print licenses.

   (e)   **Other Income.** Seventy-five percent (75%) of Publisher's Net Receipts derived from any exploitation of the Compositions not specifically referred to hereinabove.

   (f)   Publisher shall pay no royalties on professional or complimentary copies, copies or mechanical derivatives that are distributed gratuitously to performing artists, orchestra leaders or disc jockeys, or copies that are distributed, performed or transmitted on a gratis basis for advertising or promotional purposes.

   (g)   Royalties as hereinabove specified shall be payable solely to you in instances where Writer is the sole author of the entire Composition, including the words and music thereof. In the event Writer co-writes a Composition, you shall notify Publisher of the appropriate division of royalties, it being understood that the above royalty payment percentages are applicable to the royalties received with respect to your interest only of such co-written Composition.

   (h)   Except as herein expressly provided, no other royalties or monies shall be paid by Publisher to you with respect to Publisher's exploitation of the Compositions.

   (i)   Any direct or indirect payments to you with respect to the Compositions (other than the songwriter share of public performance income) shall be promptly reported and turned over to Publisher for accounting under this Agreement.

   (j)   If there is any "sample" contained in any Composition that you have not advised Publisher of at the time of Delivery, and a claim is made against Publisher in connection therewith, then in addition to all other rights Publisher may have under this Agreement or at law, you agree that any monies payable in connection with such sample will reduce only your share of Publisher's Net Receipts hereunder and Publisher's share shall not be affected thereby.

## 8.   ACCOUNTING.

(a)      Within ninety (90) days after June 30 and December 31 (or such other dates a
Publisher may elect in its sole discretion), Publisher will compute the total composite royalti s
earned by you pursuant to this Agreement and will submit to you royalty statement for each
such period together with the net amount of such royalties, if any, that shall be payable unde ·
this Agreement.  Publisher shall have the right to change its accounting periods at any time,
but shall account to you no less frequently than twice per calendar year.  Net amount as used
herein shall mean the royalties credited to your royalty account during the applicable period
less any and all unrecouped Advances and chargeable costs under this Agreement.  All royal y
statements rendered by Publisher to you shall be binding upon you and not subject to any
objection by you for any reason unless specific written objection, stating the basis thereof, is
submitted by you to Publisher within two (2) years from the date rendered.  You will not ha e
the right to sue in connection with any accounting or for royalties due during said accountin;
period unless such suit is commenced not later than one (1) year from the date Publisher den ed
the validity of any objection made by you.

(b)      (i)      You shall have the right, at your own expense, to appoint a certified
public accountant ("CPA") or a qualified attorney (the CPA or attorney being referred to in
this paragraph 8(b) as the "Designated Representative") on your behalf, to examine the bool ;
and records of Publisher insofar as they concern the Compositions and/or payments to you
hereunder.  Such audit shall be made only for the purpose of verifying the accuracy of the
statements sent to you hereunder and only as provided herein.  You shall have the right to
audit said books by providing written notice to Publisher at least thirty (30) days prior to the
date your Designated Representative intends to commence the audit.  Said audit shall be
conducted in such a manner so as not to unreasonably disrupt Publisher's other functions an:
shall be completed promptly  You may make such an examination for a particular statement
only once and only within two (2) years after the date any such statement is received as
provided in paragraph 8(a) above.  Any such audit shall be conducted only during Publisher ;
usual business hours and at a place where it keeps the books and records of the majority of i s
other writers.  Prior to the commencement of such audit, your Designated Representative sh ll
sign a letter of confidentiality agreeing not to reveal any information so acquired to anyone l ut
you or your attorney(s).  The Designated Representative shall not commence the audit if he ·r
she has begun an audit of Publisher for another client (a "Prior Audit") unless the Prior Auc it
has been concluded and finally resolved.

(ii)      If Publisher notifies you that your Designated Representative is engage 1
in a Prior Audit, you shall nevertheless have your examination conducted by that Designatec
Representative and the running of the time within which such examination may be made sha
be suspended until your Designated Representative has completed the Prior Audit, subject tc
the following conditions:

(A)      You shall notify Publisher to that effect within fifteen (15)
business days after Publisher sends you notice of the Prior Audit;

(B)      Your Designated Representative shall proceed in a reasonably
continuous and expeditious manner to complete the Prior Audit and render the final report
thereon to his/her client and to Publisher; and

(C)      Your Designated Representative's examination: (1) shall not be

commenced before the delivery to Publisher of the final report of the Prior Audit; (2) shall b : commenced within thirty (30) days thereafter; and (3) shall be conducted in a reasonably continuous and expeditious manner.

9.    **NAME AND LIKENESS.** Publisher and each licensee of Publisher shall have the right, and may grant to others the right, to reproduce, print, publish, or disseminate, in any medium, your name and the name, portrait, picture and likeness of Writer (including, withou r limitation, all professional, group, and other assumed or fictitious names used by Writer), ar d biographical material concerning you and Writer (i) in connection with uses of the Compositions (including, but not limited to, print uses of the Compositions); and (ii) for the purpose of indicating your and Writer's association with Publisher. During the Term you sh all not authorize any Entity other than Publisher to use Writer's name or likeness (or any professional, group, or other assumed or fictitious name used by Writer) solely in connection with your music publishing activities (except for songs owned and/or controlled by you whic 1 are not subject to this Agreement). Promptly following the execution of this Agreement you agree to furnish Publisher with portraits, pictures, likenesses and biographical material of Writer, if available. You further agree, during the Term, and at Publisher's reasonable request, to furnish to Publisher additional and/or updated biographies and likenesses, if available. If Publisher desires to use any likeness not supplied by you or biographical materi 1 different from that supplied by you, you shall have the right to approve same in writing, wh :h approval you shall not unreasonably withhold. Such approval shall be deemed to have been given within five (5) business days following your receipt of such material unless you notify Publisher to the contrary within that five (5) business day period. Notwithstanding the foregoing, any inadvertent failure by Publisher to obtain the aforesaid approval shall not be deemed a material breach of this Agreement, provided that Publisher uses best efforts to cur any such breach prospectively.

10.    **WARRANTIES REPRESENTATIONS AND AGREEMENTS.** — You hereby warrant, represent and agree as follows:

(a)    You are a limited liability company, duly organized, validly existing and in good standing in your state of organization, which state is Pennsylvania. You have the full power and authority to own the Compositions, conduct your business and enter into and perform this Agreement. You have been duly and validly authorized to enter into this Agreement and no consent or approval of any Entity is required for you to properly consummate and to perform this Agreement. Your execution, delivery and performance of t is Agreement does not, and will not, conflict with any laws, statues or judgments, or give rise o any claims in connection with the Compositions.

(b)    All the results and proceeds of Writer's services hereunder, including all of th : titles, lyrics, music and musical compositions, and each and every part thereof, delivered an 1 to be Delivered by you hereunder are and shall be new and original and capable of copyrigh protection throughout the Territory and that no Composition or any part thereof shall be an imitation or copy of, or shall infringe upon, any other material, or shall violate or infringe upon any common law or statutory rights of any party including, without limitation, contractual rights, copyrights and rights of privacy.

(c)    Publisher will not be required to make any payments of any nature in connect on with the acquisition, exercise, or exploitation of rights under this Agreement, except as expressly provided in this Agreement. Without limiting the generality of the preceding sentence:



06-14-00   05:25pm   From-GRUBMAN INDURSKY SCHINDLER PC        12125540429        T-557   P.12/35   F-273

(i)    You will be solely responsible for any payments due to Writer, other writers, and any other Entity in connection with Publisher's exploitation of Compositions or Publisher's exercise of Publisher's rights in and/or to them pursuant to this Agreement;

(ii)    Neither you nor Writer nor any third party has encumbered or will encumber any rights in and/or to the Compositions or any monies payable by any Entity with respect to any exploitation of the Compositions.  Without limiting the generality of the preceding sentence, no advances or other payments made by any Entity (including, without limitation, any public performance rights license organization, the Record Company, any Major Record Company or any distributor) will be chargeable against or recoupable from income derived or to be derived from any use of Compositions;

(iii)    No Entity except you or Writer is or will be entitled to receive any portion of the income derived from the exploitation of the Compositions; and

(iv)    You have not received and will neither solicit nor accept any advance payments or guarantees from any public performance rights licensing organization or other Entity, and you have not and will not encumber Publisher's right to collect One Hundred percent (100%) of the monies payable from any public performance rights licensing organization in respect of the so-called "publisher's share" of public performance income with respect to the Compositions:

(d)    You have not sold, assigned, leased, licensed or in any other way disposed of or encumbered any of the rights granted to Publisher hereunder.  There is no claim, current, pending or threatened, which is inconsistent with your warranties and representations in this Agreement.

(e)    You shall Deliver to the individual designated by Publisher all Compositions hereunder following the substantial completion or acquisition of each such Composition (You shall Deliver each Composition set forth on Schedule "A" attached hereto promptly following the execution of this Agreement).  For purposes of this Agreement, "Delivery" shall mean the submission by you to Publisher of (i) a typed lyric sheet of such Composition (if applicable) (ii) copies of the record album(s) containing such Composition or, if a demonstration tape or phonograph record is made prior to the commercial release of a record album containing such Composition, then a digital tape copy (or copy of similar quality as requested by Publisher) of such demonstration tape or phonograph record, (iii) with respect to any Composition co-owned by you, Publisher and a third party or any Composition in which a third party otherwise has an interest, a written summary indicating the third parties involved (e.g., co-writers and co-publishers) and the extent of the third parties' interest in the Composition concerned, and (iv) all necessary information, consents, licenses and permissions, (e.g., sampling clearances) such that Publisher may acquire or protect all copyrights herein acquired by Publisher in and to the Compositions and to perfect such rights.  Schedule A lists all of the Compositions written or co-written by Writer prior to the date hereof.

(f)    No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person.  "Materials", as used in this paragraph, means: (1) all Compositions, (2) each name used by you and/or Writer in connection with the Compositions; and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you and contained in or used in connection with the Compositions or the exploitation thereof.

(g)     You are a publisher member in good standing of ASCAP.  Writer is a writer member in good standing of ASCAP.  If you are in breach of your warranty of being a member in good standing of ASCAP, you hereby authorize Publisher to index the Compositions in the name of Publisher and to claim one hundred (100%) percent of the Publisher's share of performance fees in respect of the Compositions, until such time as you become a member in good standing of ASCAP or BMI or SESAC, subject, however, to Publisher's payment of performance royalties to you pursuant to this Agreement.

(h)     Publisher shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Publisher pursuant to this Agreement except as specifically provided in this Agreement.  Without limiting the generality of the foregoing, you warrant and represent that you have obtained all necessary publishing rights, copyrights and other proprietary interest from writers and/or co-writers of all songs set forth on Schedule A, and that you shall be solely responsible for any payments due to such writers, including Writer, from whom you have acquired an interest in a Composition, with respect to Publisher's exploitation of the Compositions and the other rights granted to Publisher hereunder.

(i)     You are a party to an exclusive agreement ("Songwriter Contract") with Writer, pursuant to which Writer has agreed to render to you Writer's exclusive services as a songwriter, composer and lyricist, to the best of Writer's ability and in a timely fashion, for a period at least as long as the Term.  The Songwriter Contract provides, among other provisions, that: (i) All Compositions will be works-made-for-hire and if such Compositions are not deemed to be works-made-for-hire, then One Hundred percent (100%) of Writer's interest in the worldwide copyrights, including, without limitation, all renewals, extensions and revised terms thereof (and all other rights) in New Compositions, Old Compositions, Acquired Compositions (upon acquisition) are assigned to you and are thereafter assignable; (ii) you (and your designees) have the right to utilize the name, likeness and biography of Writer in connection with the Compositions to the same extent as such rights are granted to Publisher ; (iii) you have the right to grant all of the rights granted to Publisher hereunder; and (iv) in the event of the expiration or termination of the Songwriter Contract for any reason whatsoever during the Term, Writer will render services directly to Publisher thereafter pursuant to this Agreement to the extent necessary to fulfill your and Writer's obligations hereunder.  You have or will have a written contract with each writer (in addition to Writer) of a Composition and each such contract contains or will contain the same provisions as the Songwriter Contract.  If Writer performs directly for Publisher as provided above, then it is agreed that Publisher shall have no obligations for any monies due to Writer for any periods prior to the date on which Publisher effectively acquires Writer's direct performance; Writer will have no claim to any nature against Publisher which results from your act or your failure to act or any breaches by you of the Songwriter Contract.  You will, upon execution hereof (and, thereafter, if applicable) provide Publisher with fully executed copies of all such Songwriter Contracts.  Furthermore, you will cause Writer, Publisher, and any other writer with whom Writer Writes, to execute and deliver to Publisher any document Publisher may reasonably require to effectuate Publisher's rights under this Agreement.

(j)     In no event will the monies payable to Writer or to any other writer pursuant to any songwriter contract (including the Songwriter Contract) exceed those payable to you pursuant to Paragraphs 5 and 6 hereof; however, in the event that you are in breach of the foregoing, then you, and not Publisher will be solely responsible for any such excess payments.

(k)     You will cause Writer to execute and deliver to Publisher an inducement letter and guaranty in the form of Exhibit D ("Writer Letter of Inducement and Guaranty"), annexed hereto and made a part hereof.  You will deliver a copy of Exhibit D executed by Writer upon execution of this Agreement.

(l)     You will retain all your obligations which survive the Term, including, without limitation, your warranties and representations, the duty to make all payments to Writer, and the duty to indemnify Publisher in accordance with this Agreement.

(m)     You and Writer (as applicable) are or will become and remain members in good standing of any union, Society or guild requiring such membership.  Neither you nor Writer will change or attempt to change your (or Writer's) Society, union or guild membership or affiliation without Publisher's prior written consent, such consent not to be unreasonably withheld.

(n)     Writer is a United States citizen over the age of majority in the state in which Writer resides, and Writer is a resident of the United States for tax purposes.  Writer is not under any disability or impairment of any nature which may, in any way , affect the enforceability of this Agreement and, further, Writer is legally competent to execute and to perform this Agreement.

(o)     You will not take any action (or fail to take any action) the result of which would be to derogate from otherwise impair Publisher's quiet enjoyment of the Composition and/or each and all of the rights granted to Publisher therein.

(p)     No one other than you or Writer owns any interest in a Composition or in the income earned from a Composition.

(q)     During the Term of this Agreement neither you nor Writer will: (i) write or agree to write any musical works other than those which are subject to Publisher's rights under this Agreement; (ii) enter into any other agreement which would be inconsistent with your obligations under this Agreement; or (iii) collaborate in writing musical works with anyone else, except as provided below.

(r)     If Writer writes a musical work in collaboration with any third party writer(s) then, in the absence of a written document to the contrary, you warrant and represent that the proportion of such musical work which is a Composition under this Agreement will be no less the undivided interest proportionate to the number of writers involved in the creation of such musical work (including Writer) (for example, not less than an undivided one-third (1/3) if Writer collaborates with two other writers).

(s)     None of you, Writer, or any other Entity will grant to any record company or to any other Entity, any license or permission with respect to any Composition including, without limitation, any mechanical license for use of any Composition on Records (whether or not the proposed license provides for royalties at the Statutory Rate, or varies therefrom).  You warrant and represent that you have disclosed to Publisher in writing all such licenses and permissions granted before the execution of this Agreement.  Notwithstanding the foregoing Publisher agrees that you and/or Writer shall have the right, as part of a so-called "producers agreement" or "artist agreement," to agree to a mechanical license rate (subject to Publisher's right to issue the appropriate license),provided the mechanical royalty rate is not less than the Compliance Mechanical Rate, with a so-called "cap" of ten (10) musical compositions.

13

(t)     You waive and relinquish any right in the nature of termination or reversion of rights in the Compositions which you may have or acquire under copyright law or otherwise, to the extent you may effectively do so.

(u)     You acknowledge and agree that Publisher's acceptance and/or use of any Composition does not constitute a waiver of any of your (or any other party's) warranties, representations, covenants or agreements respecting any such Compositions.

## 11.   YOUR SERVICES.

(a)     Subject to the terms and conditions hereof, you agree to perform, and to cause Writer to perform, the services required hereunder conscientiously, solely and exclusively for Publisher in accordance with the Terms and conditions hereof. Nothing contained in this Agreement shall obligate Publisher to exploit in any manner any of the rights granted to Publisher hereunder, but Publisher shall use reasonable business efforts to exploit materials delivered to it hereunder.

(b)     Except as may otherwise be set forth in this Agreement, during the Term Writer will not write or compose, or furnish or dispose of, any musical compositions, titles, lyrics or music, or any rights or interests therein whatsoever, nor participate in any manner with regard to the same for any person, firm or corporation other than Publisher, or permit the use of your name or likeness as the writer or co-writer of any musical composition by any person, firm or corporation other than Publisher except as concerns compositions written before the Term and are not subject to this Agreement. Notwithstanding the foregoing, this Agreement shall not be deemed a "personal services" contract.

## 12.   AGREEMENTS, APPROVAL & CONSENT.

(a)     As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld, except as may expressly be provided to the contrary herein.

(b)     Unless set forth herein to the contrary, your agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify Publisher otherwise within five (5) business days following the date of your receipt of Publisher's written request therefor, except in those instances when a shorter or longer time period is provided for in this Agreement.

## 13.   ACTIONS.

(a)     You agree to and do hereby indemnify, save and hold Publisher and its licensees harmless of and from any and all liability, loss, damage, cost or expense (including legal expenses and reasonable attorneys' fees) arising out of or connected with any breach by you and/or Writer of the terms of this Agreement or any third-party claim which is inconsistent with any of the warranties or representations made by you and/or Writer in this Agreement, and you agree to reimburse Publisher on demand for any payment made or incurred by Publisher with respect to the foregoing, provided the claim concerned has been settled with your prior written consent or has resulted in a final judgment. If Publisher pays more than Five Thousand Dollars ($5,000) in settlement of any claim not reduced to judgment, you will not be obligated to reimburse Publisher for the excess unless you have consented to the settlement. If you do not consent to any such settlement, you will nevertheless be requested to

14

06-14-00   06:39pm   From-GRUBMAN INDURSKY SCHINDLER PC          12126540480          T-327   P.02/02   F-801

reimburse Publisher for the full amount unless you make bonding arrangements satisfactory to Publisher in its good faith business judgment, to assure Publisher of reimbursement for all damages, liabilities, costs and expenses (including reasonable attorney fees) which Publisher and its licensees may incur as a result of that claim. Publisher may take such action as is necessary, either in your name or in its own name, against any person to protect all rights and interests acquired by Publisher hereunder. Publisher shall give you prompt notice of any claim received, and shall afford you the opportunity to resolve the matter, with legal counsel of your choice, at your sole cost and expense. In addition, Publisher may withhold monies to be paid or payable pursuant to this Agreement for any contemplated damages, reasonably related to the claim, including court costs and reasonable attorneys' fees, together with any damages that may be paid as a result of the settlement or adjudication of a claim. At your written request, Publisher will release any such monies withheld if (i) no action has been commenced on such claims within one (1) year after the date Publisher received notice of such claim, or (ii) you obtain a surety bond satisfactory to Publisher in its sole discretion in an amount sufficient to cover the anticipated damages plus costs and reasonable attorneys' fees. Upon the final adjudication or settlement of each and every claim hereunder, all monies withheld shall then be disbursed in accordance with the rights of the parties as provided hereinabove. Without limiting Publisher's other rights or remedies, all such costs and damages shall be reimbursed to Publisher on demand or, at Publisher's option, shall be deemed an advance against any and all monies payable to you hereunder.

(b)      You will, at Publisher's request, cooperate fully with Publisher in any controversy that may arise or litigation that may be brought concerning any rights and interests obtained by Publisher hereunder and may participate in any litigation through the use of counsel selected by you and provided at your sole cost and expense. Publisher shall have the right, subject to the foregoing, in its absolute discretion, to employ attorneys and to institute or defend any action or proceeding and to take any other proper steps to protect that right, title and interest of Publisher and you in and to each Composition hereunder and every portion thereof. Subject to the provisions of Paragraph 13(a) above, Publisher shall also have the right to settle, compromise, satisfy any judgment that may be rendered, or resolve or dispose of in any other manner, any claim, matter, action or proceeding. If Publisher receives monies by way of final judgment or settlement of any claim referred to in this paragraph, Publisher will credit to your account your pro-rata share, in accordance with the royalty provisions of this Agreement, of such monies after deducting all out of pocket costs and expenses incurred in the prosecution of the claim, including reasonable attorneys' fees, from the gross recovery.

14.   **NOTICES**.   Any notice, consent, approval, demand or other communication to be given or sent to the other party hereunder must be in writing and shall be deemed to have been duly given or sent if sent by personal delivery, registered or certified mail, return receipt requested, or by overnight (or two (2) day) air express to such party at the address set forth on Page 1 above, or to such other address as either party may hereafter send to the other party by like notice. Royalty statements and payments may be sent by regular mail. Except as otherwise herein stated, the date of mailing of any such communication shall be deemed the date upon which such communication was given or sent. All notices to Publisher shall be sent to the attention of Vice-President Business Affairs, with a copy to Steve Gottlieb. A copy of each notice to you shall be sent by first class U.S. mail or fax to Richard Nichols, 5700 Woodstock Street, Philadelphia, PA 19138. Publisher's failure to send such copy shall not be a breach of this Agreement.

15.   **ASSIGNMENT**.   Publisher shall have the right to assign, license or otherwise transfer any or all of its rights, powers, privileges and obligations hereunder to any other

person, firm or corporation. Publisher shall not have the right to assign this entire Agreement except to a parent company, an affiliate or subsidiary, or to a person, firm or corporation who acquires all or substantially all of Publisher's assets or to a person or entity with whom Publisher may merge. You shall not have the right or power to assign this Agreement, or any of your rights hereunder, except with the written consent of Publisher, not to be unreasonably withheld.

16.    **FORCE MAJEURE**.       Publisher reserves the right (without prejudice to any other right or remedy which Publisher may have under this Agreement or otherwise) at any time to suspend the running of the then-current Contract Period, if, by reason of any act of God, fire, flood, earthquake, strike, civil commotion, act of government, or any order, ruling or action of any labor union or association, judicial or arbitral order, failure of technical facilities, failure or delay of transportation facilities or cause of any other nature not reasonably within Publisher's control and affecting you, Writer, Publisher or the music publishing business in general, Publisher becomes hampered in its normal business operations, or such operations become commercially impractical or impracticable for any reason. Any suspension will commence upon Publisher giving you notice and will last for the duration of such contingency, but in the event that such contingency applies to Publisher alone, then the duration will in no event be longer than twelve (12) months. Notwithstanding the foregoing, but subject to the 12 months limitation set for in the previous sentence, Publisher may elect (without limitation of or prejudice to any other rights or remedies which Publisher may have under this Agreement or otherwise and without giving rise to any right or remedy on your part), by giving notice to you at any time prior to the end of such suspension, to extend the applicable Contract Period by adding to what would otherwise be the end of such Contract Period the length of the suspension plus a further period of fifty (50) days.

17.    **EVENTS OF DEFAULT; REMEDIES**

      17.01. In the event of the occurrence of an event of default (as described in paragraph 17.02 below), Publisher will have the right to exercise any and all of the options specified below, or to refrain therefrom, without prejudice to any other rights or remedies to which Publisher may be entitled under this Agreement or generally at law or equity. If Publisher elects to exercise any of the options specified below, then Publisher shall give you notice of same not later than ninety (90) days after the later of your notice to Publisher of the occurrence of such event or Publisher's otherwise learning that such an event has occurred.

      (a)    In the event of the occurrence of an event of default as described in paragraphs 17.02(a)(iv) and/or 17.02(a)(v) below, Publisher shall have the right to: (i) suspend all of Publisher's obligations under this Agreement, including, without limitation, Publisher's obligation to account to you and to make payments, said payments including, without limitation, Advances and royalties; and (ii) suspend the running of the Term for the duration of such event or contingency. Unless Publisher notifies you otherwise, the Contract Period in which the event of default commenced will be automatically extended by a number of days equal to the total number of days of the suspension plus an additional sixty (60) days or such fewer number of days as Publisher will advise you. No suspension will suspend or otherwise impair in any manner Publisher's rights or your obligations under this Agreement;

      (b)    Publisher shall have the right to terminate this Agreement (whether or not you have commenced curing the default before such termination), in which event Publisher will have no obligations or liabilities to you under this Agreement except for Publisher's obligations, if any, for Compositions delivered prior to that termination. If Publisher so terminates this Agreement, you will pay Publisher, on demand, an amount equal to the total

16

(even if paid in installments) of any unrecouped Advances paid pursuant to this Agreement in connection with any Compositions not delivered to Publisher. Publisher will continue to have all rights, in accordance with the terms hereof, in all of the Compositions delivered prior to termination of this Agreement;

(c)     Publisher shall have the right to reduce the MDRC for the Contract Period concerned, and to reduce proportionately the applicable Advance; or, in the event you fail to timely deliver the complete MDRC for the reason set forth in paragraph 17.02(a)(i) below, to reduce proportionately the Advance payable for the Contract Period concerned. Nothing contained herein will result in Publisher's waiver of any other rights hereunder with respect to Compositions and future Contract Periods;

(d)     In the event of the occurrence of an event of default, as described in any of paragraphs 17.02(a)(iv) through (vii), inclusive, or if you, but not Writer, are subject to an occurrence set forth in paragraphs 17.02(b) or 17.02(c) below, Publisher shall have the right to require that Writer render Writer's personal services directly to Publisher for the remainder of the Term, including any extensions, for the purpose of delivering Compositions, upon all of the terms and conditions of this Agreement. If Publisher exercises its option under this paragraph 17.01(d), Writer will be deemed substituted for you as a party to this Agreement as of the date of Publisher's option exercise. With respect to any Compositions delivered subsequently, the royalties and any Advances payable hereunder will be payable to Writer, subject to recoupment of all Advances and other charges.

17.02.  Each of the following will constitute an event of default under this Agreement

(a)     If for any reason whatsoever: (i) Writer's health becomes substantially impaired, with the result that Writer is unlikely to deliver musical works of the quality and in the quantity which induced Publisher to enter into this Agreement; (ii) Either you or Writer is convicted of a felony; (iii) Writer ceases to actively pursue a career as a writer; (iv) You attempt to assign this Agreement or you or any holder of any voting securities or other indicia of control attempt to sell, assign, transfer or otherwise alienate such voting securities and/or control of your operations; or (v) You or Writer refuse, neglect, fail, breach, are unable to, or otherwise do not comply with any of your or Writer's other respective material obligations hereunder, including without limitation, Writer's exclusivity; (vi) You have not delivered the MDRC for a particular Contract Period within twenty-four (24) months following the commencement of the immediately preceding Contract Period; or (vii) Your failure or refusal to disclose to Publisher the existence of all information concerning any Samples contained in any musical work or Recording at the time such musical work or Master is delivered to Publisher under this Agreement.

(b)     If either Writer or you: (i) commences a voluntary case under any applicable bankruptcy, insolvency, or other similar law now or hereafter in effect; (ii) consents to the entering of an order for relief in any involuntary case under such law; (iii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee or sequestrate (or similar appointee) for Writer or you for any substantial part of Writer's or your property; (iv) makes an assignment for the benefit of creditors; or (v) takes any action in furtherance of any of the foregoing; or

(c)     If a court having jurisdiction over Writer's or your affairs or property (i) enters a decree or order for relief in respect of Writer or you or any of Writer's or your property in an involuntary case under any applicable bankruptcy, insolvency or other similar

17



law now or hereafter in effect; (ii) appoints a receiver, liquidator assignee, custodian, trustee or sequestrate (or similar appointee) for Writer or you for any substantial part of Writer's or your property; (iii) orders the winding up or liquidation of Writer's or your affairs; and such decree or order remains unstayed and in effect for a period of fifteen (15) consecutive days.

(d)     You will give Publisher notice promptly after the occurrence of any event described in this paragraph 17.02. Notwithstanding anything to the contrary expressed or implied in this Agreement, your failure or refusal to give Publisher notice of any event described in this paragraph 17.02 shall not deprive Publisher of, or otherwise reduce or limit the rights granted to Publisher in this Article 17 or otherwise; at any time after Publisher shall learn of the occurrence of any such event, Publisher shall have the right, but not the obligation, to give such notice to you and Publisher's notice will have the same force and effect as if you had timely given the notice to Publisher. Whether or not Publisher gives you such notice, Publisher shall have and any and/or all of the rights granted Publisher in this Article 17.

17.03. In the event that you have not fulfilled the MDRC on a timely basis, and in the further event that Publisher does not elect to exercise any of Publisher's options specified in paragraph 17.01 above, then the Term shall continue as provided in Article 2 of this Agreement, and all of your and Writer's obligations as provided in this Agreement shall continue.

17.04. The exercise or not of any of Publisher's options under this Article 17 will not limit Publisher's right to exercise any other option under this Article 17 nor limit any of Publisher's rights or remedies, including, without limitation, Publisher's rights to recover damages or to obtain injunctive relief, or any of Publisher's other rights, including without limitation all the rights granted under this Agreement with respect to all Compositions and the benefit of all of your warranties, representations and agreements hereunder. You acknowledge that the right to own and exploit the Compositions and the Delivery Materials is of unique, peculiar, exceptional, and extraordinary value and that, commencing immediately upon creation, each musical work and portion thereof is of unique, peculiar, exceptional and extraordinary value. You confirm that Writer's services are of a special, unique, unusual, extraordinary and intellectual character involving skill of the highest order which gives them a peculiar value, for the loss of which damages in an action at law cannot adequately compensate Publisher. You acknowledge that the loss of any Composition or portion thereof or any rights therein or Writer's failure to perform for Publisher exclusively and on a timely basis under this Agreement would cause Publisher irreparable injury, and you further acknowledge that time is of the essence hereunder. You acknowledge that even a threatened breach by you or Writer of the undertakings, obligations, representations, warranties, covenants or agreements set forth in this Agreement would cause Publisher immediate and irreparable injury, including harm to the good will and valuable reputation Publisher has in the entertainment and music publishing industries, for the loss or impairment of which Publisher would not have an adequate remedy at law and monetary damages would not adequately compensate Publisher for such loss or impairment. You acknowledge and agree that Publisher will therefore be entitled to temporary restraining orders, preliminary and permanent injunctions (as applicable) to enforce any provision of this Agreement and to prohibit Writer from performing any services contemplated by this Agreement for any Entity other than Publisher. You and Writer waive the right to demand Publisher's posting of a bond in connection with Publisher seeking restraining orders or other injunctive relief.

17.05. In the event the MDRC in any Contract Period is not delivered on a timely ba is in accordance with subparagraph 17.02 (a)(vi), then the Contract Period shall be extended ur il Delivery has occurred, subject to paragraph 17.01(a) above.

18.    **POWER OF ATTORNEY**. If you do not execute any documents submitted for execution, which are necessary to effect the terms and conditions of this Agreement, within t n (10) business days after receipt by you of such documents, you do hereby irrevocably constitute, authorize, empower and appoint Publisher, or any of its officers, your true and lawful attorney in your name, and in your place and stead, or in Publisher's name, to take ar d do such action and to make, sign, execute, acknowledge and deliver any and all instruments r documents which are necessary solely to vest in Publisher any of the rights or interests grant d by you hereunder, including but not limited to such documents required to secure to Publish r the renewals and extensions of copyrights to the Compositions throughout the Territory and ne right to such copyrights throughout the renewal terms. Publisher shall promptly provide you with copies of any documents executed by Publisher in your name.

19.    **COPYRIGHT REGISTRATION**. Claim to copyright in the Composition may be registered by Publisher in the joint names of Publisher and you in the Office of the Register f Copyrights of the United States of America. If the Compositions have been registered for copyright in your name, you shall simultaneously with the execution herewith, deliver to Publisher a written assignment of an undivided fifty percent (50%) interest therein in the for n attached hereto as Exhibit A. Upon written request from you, Publisher agrees to provide y u with copies of all copyright registrations and similar documents affecting the Compositions.

20.    **DEFINITIONS**.

(a)    "Advance" -- a prepayment of royalties. Advances are chargeable against and recoupable from any royalties otherwise payable to you under this Agreement.

(b)    "Affiliate" -- any business enterprise that is owned and/or controlled in whole or in part (directly or indirectly) by you or by Publisher, as the case may be, or that owns you r Publisher, as the case may be, or that shares a common owner with you or Publisher, as the case may be.

(c)    "Album" -- a sufficient number of newly-recorded studio Recordings to comprise one (1) or more compact discs, or the equivalent, of not less than thirty-five (35) minutes of playing time, unless the Record Company that commercially Released the Recordings has agreed to accept an "Album" consisting of less than thirty-five (35) minutes of playing time.

(d)    "Commercial Release" or "Commercially Released" -- the initial general U.S release by a "Major U.S. Record Company" (i.e., a record label owned by or regularly distributed by one of the major distribution companies, currently BMG, EMD, Sony, UMG or WEA) of a Record hereunder on an "Anglo" label at a "top-line" price through normal retail channels in the United States.

(e)    "Compliance Mechanical Rate" - a minimum of seventy-five percent (75%) o the so-called "statutory rate" (respecting compulsory mechanical licenses under U.S. copyri ht laws and regulations), at the time the Record of the Composition is delivered to the Record Company that Commercially Releases the Record (or at the time the recording was commenced, if so required in the contract with the Record Company) as the case may be);

provided that the Record Company concerned must confirm in writing that it will pay mechanical royalties to Publisher at such Compliance Mechanical Rate regardless of any "samples" or any so-called "caps" on the number of musical compositions (including Compositions) on such Record. If the Record Company concerned advises Publisher that the mechanical royalties will be less than the Compliance Mechanical Rate, then the Composition shall not be a Full New Composition.

(f)   "Cover Recording" — any Recording of a Composition other than a Recording produced by Writer by you, or a Recording embodying the featured performance of Writer as the artist.

(g)   (1)   "Gross Receipts" — all monies actually received by Publisher (or credited to Publisher's account against an advance previously received) in the United States from the exploitation of the Compositions in the Territory, less: (i) applicable taxes; and (ii) reasonable out of pocket collection costs.

(2)   Notwithstanding the foregoing, for purposes of determining Gross Receipts from the exploitation of the Compositions outside the United States, the Gross Receipts shall be calculated as follows: income received by Publisher generated from exploitation of any musical composition outside the United States and collected by Publisher's subpublishers shall be no less than eighty five percent (85%) of such amounts (other than the "publisher's share" of public performance income and mechanical income from territory-originated Cover Recordings), sixty percent (60%) of the "publisher's share" of public performance income, and sixty percent (60%) of mechanical income from territory-originate Cover Recordings, all such royalty calculations to be computed "at the source" (as that term is understood in the music publishing industry). To the extent that Publisher receives greater amounts than those set forth above, Gross Receipts shall be calculated on the greater amount.

(h)   "Net Receipts" -- Gross Receipts, less the out of pocket costs actually incurred by Publisher in connection with the Compositions (including, without limitation, costs of lead sheets, copyright fees, and, with your approval and consent, advertising and promotion costs).

(i)   "Net Sales" — gross sales of an Album in the United States less returns and credits and reserves held by the releasing Record Company.

(j)   "Record" or "Phonograph Record" -- all forms of reproduction, now or hereafter known, manufactured and/or distributed primarily for personal use, home use, school use, juke box use or use in means of transportation, audiovisual Recordings, interactive media (e.g., CD-ROM), electronic transmissions, digital transmissions, Internet, etc.

(k)   "Recording" — any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, that is or is intended to be embodied in or on a Record.

(l)   "Territory" -- the Universe.

(m)   "Entity" -- a person, firm or corporation or other legal entity.

21.   **ENTIRE AGREEMENT.**   This Agreement supersedes any and all prior negotiations, undertakings and agreements between the parties hereto with respect to the subject matter hereof. Each of the parties acknowledges and agrees that neither party has made any

20



representations or promises in connection with this Agreement, or the subject matter hereof, that are not contained herein.

22. **MODIFICATION, WAIVER.** This Agreement may not be canceled, altered, modified, amended or waived, in whole or in part, in any way, except by an instrument in writing signed by both Publisher and you. The waiver by Publisher or you of any breach of this Agreement in any one or more instances, shall in no way be construed as a waiver of an subsequent breach (whether or not of similar nature) of this Agreement by you or Publisher.

23. **CHOICE OF LAW, FORUM.** This Agreement shall be governed by and construed under the laws and judicial decisions of the State of New York. The New York courts (state and federal) only will have jurisdiction of any controversies regarding this Agreement and the parties hereto consent to the jurisdiction of said courts.

24. **MISCELLANEOUS.**

(a) Each option and/or election granted to Publisher hereunder is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by Publisher in its notices of exercise of such option or election.

(b) In entering into this Agreement, and in providing services pursuant hereto, yc shall have the status of an independent contractor and nothing herein contained shall contemplate or construe you as Publisher's agent or employee.

(c) This Agreement shall not become effective until executed by all proposed Parties hereto.

(d) Any and all Exhibits and Schedules annexed hereto together with this basic document shall be taken together to constitute the agreement between you and Publisher.

(e) No alleged breach of this Agreement by Publisher shall be deemed material, unless notice of such alleged breach is given and Publisher fails to discontinue the practice complained of (or otherwise cure such breach) within thirty (30) days after receipt of such notice, provided such breach is reasonably capable of being fully cured within such thirty (30)-day period, or, if such breach is not reasonably capable of being fully cured within such thirty (30)-day period, provided that Publisher commences to cure such breach within such thirty (30)-day period and proceeds continuously and expeditiously thereafter to complete the cure within a reasonable time period following the end of such thirty (30)-day period. You acknowledge that your rights and entitlements under this Agreement are purely economic in nature, and that the impairment thereof is clearly calculable and compensable in damage. Therefore, you shall not, under any circumstances, be entitled to claim, seek or obtain: (i) a y equitable relief (other than relief specifically with respect to the particular practice complain d of, to the extent practicable); or (ii) any other relief which causes a termination, rescission o reversion of the rights granted to Publisher herein or which impairs Publisher's rights (or th rights of Publisher's licensees, designees or assigns) to exploit the Compositions hereunder. You shall not, under any circumstances, be entitled to terminate this Agreement, based upor without limitation, any claimed breach by Publisher, of which you give notice to Publisher hereunder, whether or not the same is cured, and your sole and exclusive remedy shall be fc money damages.



(f)    No alleged breach of this Agreement by you shall be deemed material unless notice of such alleged breach is given and you fail to discontinue the practice complained of (or otherwise cure such breach) within thirty (30) days after receipt of such notice, except fo those breaches that are incapable of being cured (e.g., your or Writer's delivery of musical compositions to third parties).

(g)    If any part of this Agreement shall be held to be void, invalid or unenforceabl, it shall not affect the validity of the balance of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day an year first above written.

TVT MUSIC, INC.

By_____

    Its _____


TUFF JEW PRODUCTIONS, LLC

By_____

Federal Tax I.D. Number 23-3032945

22