

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/18/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MUSIC ROYALTY CONSULTING, INC.,

Plaintiff,

-against-

RESERVOIR MEDIA MANAGEMENT, INC.,

Defendant.

---

No. 18 Civ. 9480 (CM)

### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANTS' *DAUBERT* MOTIONS; AND GRANTING IN PART AND DENYING IN PART THE MOTIONS FOR SUMMARY JUDGMENT

McMahon, J:

The parties to this action are publishing companies that purchase the rights to future royalties from recording artists. Plaintiff Music Royalty Consulting, Inc. ("MRCI") alleges that Defendant Reservoir Media Management, Inc. ("Reservoir") violated its contractual obligations by withholding or short-changing royalties owed to MRCI under a publishing agreement.

Musical artists typically sign publishing agreements, in which they assign the copyright and administration rights for particular songs to a publishing company for a specified limited duration. The publishing company then licenses the songs, monitors their use, and collects the royalties that are due by virtue of the copyrights. These fees are then divided per the terms of the agreement; the publishing company sends the musical artist a "writer's share," and retains its own "publisher's share." After the term of the agreement expires, all copyrights and royalties revert back to the songwriter.

The publishing agreement principally at issue in this case (the "Publishing Agreement" or the "Agreement") was entered into in 2000 by Reservoir's predecessor-in-interest and a "songwriting services" company called Tuff Jew, which is wholly owned  by Scott Storch – a singer and songwriter who was, at one time, a prominent businessman in the music industry.  The Publishing Agreement required Tuff Jew to deliver the copyrights to Storch's musical compositions (songs) in exchange for which Tuff Jew would receive the entire writer's share *and* a portion of the publisher's share in the publishing income.

In Plaintiff MRCI's First Amended Complaint ("FAC"), MRCI asserts that, in 2012, Tuff Jew assigned to MCRI its right to the writer's share of income due to it under the Publishing Agreement to MRCI.  *See* Dkt. No. 55. MRCI alleges that Reservoir underpaid royalties owed to MRCI over several accounting periods – and then, sometime in early 2018, stopped paying royalties to MRCI altogether.  The FAC asserts a claim for breach of contract arising out of these failures to pay amounts due and owing under the Publishing Agreement.

On October 31, 2019, this court granted Reservoir's motion to dismiss so much of the FAC as sought to collect for royalties that were allegedly underpaid relating to statements issued in March 2013, September 2013, March 2014, September 2015, and March 2015.  *See* Dkt. No 69. There is no dispute that MRCI did not object to these statements until December of 2017. Accordingly, the court concluded that any claim for unpaid royalties for the period covered by these statements was barred, as a result of the two-year incontestability period set forth in the Publishing Agreement (explained in the court's opinion found at Docket No. 69).

As a result, MRCI's claim for breach of contract is limited to (1) the alleged underpayment of the last three royalty payments made by Reservoir to MRCI, in March 2016, September 2016, and March 2017; and (2) Reservoir's failure to pay any royalties to MRCI after March 2017.

Plaintiff now moves for partial summary judgment (liability only) on so much of its breach of contract claim as is predicated on Reservoir's admitted refusal to account for royalties earned after September 2017 or to pay royalties after March 2017. MRCI does not seek summary judgment on so much of its claim as is predicated on the alleged underpayment of royalties for prior periods. MRCI also seeks summary judgment dismissing Reservoir's affirmative defense of indemnification. Dkt. No. 86.

Defendant cross-moves for summary judgment dismissing Plaintiff's breach of contract claim in its entirety. Dkt. No. 99.

Also before the court are Plaintiff's *Daubert* motions to exclude the expert opinions of Reservoir's proposed expert witnesses: Barry M. Massarsky and Clark Miller, LLC. Their respective expert reports can be found at Docket Numbers 91 and 94.

For the reasons outlined below, the motions are decided as follows:

1. MRCI's motion for partial summary judgment (i) holding Reservoir liable for its failure to make royalty payments; and (ii) dismissing Reservoir's affirmative defense based on indemnification is GRANTED.

2. Reservoir's cross-motion for summary judgment dismissing MRCI's breach of contract claim is DENIED.

3. MRCI's motion to exclude the expert opinion of Barry M. Massarsky is GRANTED.

4. MRCI's motion to exclude the expert opinion of Clark Miller is GRANTED in part and DENIED in part.

## BACKGROUND

For the purpose of the motions before the court, facts are drawn from the parties' joint and respective Rule 56.1 statements and counter statements of facts, and the record in support of Plaintiff's motion for partial summary judgment ("MRCI Mot."), Defendant's cross-motion for summary judgment ("Res. Mot."), and Plaintiff's *Daubert* motions.

The court presumes familiarity with the facts of this case, which have been recounted at length in two previous opinions. *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt.*, Inc., No. 18-CV-9480 (CM) (KNF), 2019 WL 1950137, at *1 (S.D.N.Y. Apr. 17, 2019) (Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Complaint) (Dkt. No. 48); *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc*., No. 18-CV-9480 (CM) (KNF), 2019 WL 6335261 (S.D.N.Y. Oct. 31, 2019) (Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the First Amended Complaint, Dkt. No. 69).

Accordingly, only the facts relevant to the pending motions are summarized below.

A. *Key Players*

Plaintiff MRCI, a California corporation, is a publishing company. As part of its business, it purchases music-publishing royalty income from artists. MRCI also buys music-related assets and other income streams. *See* Joint Local Rule 56.1 Statement of Undisputed Facts, Dkt. No. 102 ("JSUF"), ¶ 4.

Defendant Reservoir, a Delaware corporation, is an independent music publisher. Like MRCI, Reservoir owns musical copyrights, administration rights, master recordings, and royalty collection rights, and administers and markets music. JSUF ¶ 1. Reservoir is the successor-in-interest to a company called TVT Music, Inc. ("TVT"). *Id*.

Non-party Scott Storch is a renowned songwriter and music producer who has co-written and produced multiple hit songs, including Justin Timberlake's "Cry Me a River," Beyoncé's

"Naughty Girl," Dr. Dre's "Still D.R.E.," and 50 Cent's "Candy Shop." Storch has his own-wholly owned "songwriting services" company, Tuff Jew Productions, LLC ("Tuff Jew"). JSUF ¶¶ 2-3. For the limited purpose of this opinion, Storch (the person) and Tuff Jew (Storch's company) are often referenced interchangeably.

B. *Operative Agreements*

There are four agreements relevant to the instant dispute between the parties. Plaintiff's claim for breach of contract relates to only one of those agreements – the Publishing Agreement, explained in detail below – but it is impossible to understand this lawsuit without understanding all four agreements.

i.   The Publishing Agreement

On June 14, 2000, Tuff Jew entered into the Publishing Agreement with Reservoir's predecessor-in-interest, TVT.

Per the terms of the Publishing Agreement, Tuff Jew agreed to provide Storch's songwriting services "exclusively" to the publisher (TVT, and later Reservoir, referred to interchangeably as the "publisher") and granted the publisher 50% of its copyrights in Storch's songs – both those he had already written and those he would write during the life of the Agreement – in exchange for receiving 100% of the writer's share *and* 50% of the publisher's share in the publishing income. *See* Publishing Agreement, Dkt. No. 100-5, ¶ 7. The publisher retained the other half of the publisher's share. *Id.* In exchange for Storch's exclusive services and assignment of copyrights, the publisher agreed to license and market the compositions, and to collect and distribute "all monies earned." Publishing Agreement, ¶ 5(b).

The initial period of the Publishing Agreement ran from June 14, 2000, through June 30, 2001 (the "Initial Period"). During the Initial Period, Tuff Jew was not obligated to deliver a

specific number of new songs.  But after the initial period, the publisher had two separate options to extend the term of the Publishing Agreement for additional periods, on the same terms and conditions that were applicable to the Initial Period. Publishing Agreement, ¶ 2(a) & (b). During each successive options period (each a "Term" of the Publishing Agreement), Tuff Jew was required to satisfy its Minimum Delivery and Release Commitment ("MDRC") by delivering no fewer than ten new songs for the publisher to exploit on their mutual behalf.[1]  Each new Term period began as soon as the publisher exercised its option to extend the life of the Agreement and continued until thirty days after Tuff Jew fulfilled its MDRC for that option period, but not earlier than one year after the commencement of the period.  Publishing Agreement, ¶ 2(b).

TVT, the publisher at the time, exercised a new option period upon termination of the Initial Period of the Publishing Agreement in June of 2001, and again after the first option period terminated when Tuff Jew fulfilled the MDRC.  It is not clear from the record exactly when the first options period ended and the second commenced.

Under the Publishing Agreement, the publisher was obligated to pay the songwriter a cash advance when exercising each option period.  Publishing Agreement, ¶ 6.  Advances under the Agreement are "a prepayment of royalties. . .. chargeable against and recoupable from any royalties otherwise payable." *Id*., ¶ 20(a).  The publisher may also recoup from royalties certain chargeable costs.  Under the Agreement, "chargeable costs" include the costs of sheets, copyright fees, and advertising and promotion costs. *Id*., ¶ 8(a).

The Publishing Agreement required the publisher to provide account statements twice yearly – within ninety days after June 30 and December 31.  In such a statement, the publisher was required to apprise Tuff Jew of the gross amount of royalties earned during the period, as well as

---

[1] The number of songs required to satisfy the MDRC would eventually change as a result of subsequent amendments to the Publishing Agreement.  However, those changes have no relevance to this lawsuit.

the net amount of royalties payable, calculated as gross royalties less unrecouped advances and chargeable costs.  Publishing Agreement, ¶ 8(a).  The songwriter had the right, on 30 days' notice, to appoint "a certified public accountant . . .. or a qualified attorney . . .. to examine the books and records of Publisher insofar as they concern the Compositions and/or payments to you hereunder." *Id*., ¶ 8(b)(i).

In addition to the right to conduct its own detailed accounting, Tuff Jew had the right to challenge any accounting statement and corresponding net royalty payment within two years of the date rendered by delivering to the publisher a "specific written objection" to the statement in question.  *Id*., ¶ 8(a).  After two years, royalty statements were deemed binding and not subject to objection. *Id*. In addition to this incontestability period, the Agreement provided a short statute of limitations; any lawsuit brought "in connection with any accounting or for royalties due during said accounting period" had to be "commenced not later than one year from the date Publisher denied the validity of any objection made." *Id*.

The Publishing Agreement is governed by New York law.  *Id*., ¶ 23.

Three provisions in the original Publishing Agreement are particularly relevant to this lawsuit:

*First* is the **<u>events of default provision</u>**. Paragraph 17 of Publishing Agreement provides that certain events constitute "events of default," and specifies the remedies available to the publisher upon the occurrence of an event of default.  Pursuant to the Agreement, should "Publisher elect[] to exercise any of the options . . .. then Publisher shall give you notice of same not later than ninety (90) days after the later of your notice to Publisher of the occurrence of such event or Publisher's otherwise learning that such an event has occurred." Publishing Agreement, ¶ 17.01.

*Second*, the Publishing Agreement includes an **indemnity provision**, pursuant to which Tuff Jew agreed to "indemnify, save and hold Publisher . . . harmless of and from any and all liability, loss, damage, cost or expense (including legal expenses and reasonable attorneys' fees) arising out of or connected with any breach by [Tuff Jew] and/or [Storch] of the terms of this Agreement or any third-party claim which is inconsistent with any of the warranties or representation made by [Tuff Jew] and/or [Storch] in this Agreement." Publishing Agreement, ¶ 13(a).

*Third*, the Publishing Agreement includes an **anti-assignment provision**, which provides, in relevant part, that Tuff Jew "shall not have the right or power *to assign this Agreement or any of [its] rights hereunder,* except with the written consent of the Publisher not to be unreasonably withheld." Publishing Agreement, ¶ 15 (emphasis added).

On December 11, 2002, TVT and Tuff Jew amended the Publishing Agreement by, *inter alia*, providing that the publisher could renew the agreement for five additional Terms instead of two, and by reducing the MDRC (as defined in Paragraph 3 of the Publishing Agreement) in the third, fourth, and fifth option periods from ten compositions to six (subject to certain terms and conditions). *See* Dkt. No. 88-1, ¶¶ 18-19.

In April 2010, Reservoir acquired TVT's catalogue, including TVT's interest in the Publishing Agreement. Reservoir, as successor-in-interest to TVT, began collecting all royalties and paying Tuff Jew its share of publishing income owed under the Publishing Agreement.

ii.   The Asset Purchase Agreement

On September 29, 2011, Tuff Jew entered into an asset purchase agreement with Reservoir whereby Reservoir purchased the 50% portion of the publisher's share that Tuff Jew had originally retained under the Publishing Agreement (the "Asset Purchase Agreement"). *See* Dkt. No. 44, Ex.

A.  Reservoir paid $2.3 million to, *inter alia*, acquire Tuff Jew's remaining 50% interest in the publisher's share, as well as Tuff Jew's remaining 50% interest in the copyrights in the compositions.  *Id.*

Simultaneously with the Asset Purchase Agreement, in 2011 Tuff Jew and Reservoir once again amended the Publishing Agreement.  *Id.*, ¶ 63.  The 2011 amendment deemed the third option period fulfilled (it is not clear from the record whether Tuff Jew fulfilled the MDRC for the third option period) and began a fourth option period.  *Id.*, ¶¶ 64-65.

After execution of the Asset Purchase Agreement, Tuff Jew retained a 100% interest in the writer's share. That changed in April of 2012, when Tuff Jew assigned its rights to the writer's share under the Publishing Agreement to Plaintiff MRCI.

      iii.    The Assignment Agreement

On April 13, 2012, Tuff Jew and MRCI entered into an agreement pursuant to which Tuff Jew assigned to MRCI its right to receive accountings and to be paid the writer's share of the publishing income it derived from the Publishing Agreement, as well as any "pending and future claims," including those for "underpayment or non-payment of royalties," and its audit rights under the Agreement in exchange for the payment of  $775,000.  *See* Dkt. No. 89-4, Ex. 4 (the "Assignment Agreement" or the "Assignment") at 3, 5.

And while MRCI agreed to advance approximately 8% of the total purchase price to Tuff Jew, full payment was conditioned on  Reservoir's consenting to the Assignment. This was understandable, given the anti-assignment provision; although Reservoir could not unreasonably withhold consent to the assignment, it did have the right to consent, and MRCI declined to move forward until that consent was obtained.  The Assignment Agreement further provides that, for MRCI to pay Tuff Jew the full purchase price, the "royalty payor(s)" (Reservoir) "must also

confirm that the Rights are free and clear of any and all liens, claims, or encumbrances before Closing may occur."  Assignment Agreement, ¶ 2(a)(ii).

     iv.   <u>The Letter of Direction</u>

Representatives for Reservoir and MRCI proceeded to exchange emails over the ensuing weeks reflecting their shared desire to fund the transaction for the benefit of Tuff Jew and Storch. Dkt. No. 88-1, ¶¶ 76-77.

On June 19, 2012, Reservoir and Storch executed a fourth agreement, known as a letter of direction (the Letter of Direction"). In the Letter of Direction, Storch represented that he "irrevocably and perpetually sold [his] royalty rights to MRCI," and directed Reservoir to "irrevocably and perpetually pay, make, and send to MRCI . . . [a]ll amounts otherwise due [to] me (or any affiliated entities) under the Publishing Agreement (including, without limitation, **all royalties, all advances, and all payments**)."  Letter of Direction, Dkt. No. 44-3, at 1 (emphasis in original).

Although referenced in the Letter of Direction, MRCI is not a party to that agreement; the only signatories are Storch and Golnar Khosrowshahi, Lafargue's successor as President of Reservoir.  MRCI is likewise not a third-party beneficiary to the Letter of Direction; the Letter provides that, "I [Storch] understand and acknowledge that neither MRCI nor any other person or entity is a third party beneficiary of any kind to this Letter of Direction," and  "This Letter of Direction is not a waiver of any of [Reservoir]'s rights or Tuff Jew's obligations under the Publishing Agreement."  *Id.*  However – and significantly for this lawsuit – the Letter of Direction explicitly states that it was "made in connection with the Music Publisher Royalty Assignment dated April 13, 2012 (the 'Assignment')." *Id.*

MCRI viewed the Letter of Direction as Reservoir's consent to Stoch's assignment of his right to receive accounting statements and corresponding royalty payments pursuant to the Agreement to MCRI.  As a result, it paid Storch the remaining balance of the purchase price due under the Assignment Agreement.

C.   *Timeline of Relevant Events*

Following the execution of the Letter of Direction, Reservoir began paying the writer's share of the royalties to MCRI. However, MRCI alleges that Reservoir wrongfully reduced the amount that should have been paid – starting with failing to pay  $131,013.77 from the very first royalty payment it directed to MRCI.

As noted above, pursuant to Paragraph 8 of the Publishing Agreement, royalty payments made thereunder were not subject to objection for any reason unless specific written objection, stating the basis thereof, was submitted to Reservoir within two years from the date rendered. Publishing Agreement, ¶ 8.  Moreover, "the right to sue in connection with any accounting or for royalties due during said accounting period" expires "one year from the date [Reservoir] denied the validity of any objection made." *Id*.

But MRCI did not challenge the allegedly low royalty payment within the two-year window available to it under the Publishing Agreement. Hoping to resolve matters without confrontation, MRCI made the business decision to "wait and see"  this would prove to be a one-time thing, after which time Reservoir would honor the Publishing Agreement and the Assignment to which it had consented.

As it turned out, the deduction was not a one-time thing. Over the ensuing four and half years, Reservoir allegedly "continued to take improper deductions," albeit in lesser amounts than the initial alleged $131,013.77 deduction.  And MRCI continued not to challenge the statements.

As a result, statements issued in March 2013, September 2013, March 2014, September 2015, and March 2015 became incontestable after the passage of two years. *See* Dkt. No 69.

Reservoir continued to pay MRCI royalties and make accountings until April 2017.  Dkt No. 88-1, ¶ 129.

### The Adversary Proceeding in Bankruptcy Court Involving Storch and MRCI.

On June 3, 2015, Storch filed for bankruptcy under Chapter 7 in the United States Bankruptcy Court for the Southern District of Florida.  Dkt No. 88-1, ¶ 106; Schacter Decl. Ex. D; *see also In re Storch*, Bk. No. 15-20095-BKC-JKO, (S.D. Fla.).[2]  On June 17, 2015, Scott N. Brown, Esq. was appointed as the Chapter 7 trustee (the "Trustee") of Storch's bankruptcy estate. Dkt. No. 100-59, Order Granting Trustee, Scott N. Brown's Ex Parte Motion for Employment of Scott N. Brown, Esquire and Bast Amron LLP as Attorneys for the Trustee Nunc Pro Tunc to June 3, 2015.

Storch's filing of a Chapter 7 bankruptcy petition was an event of default under the Publishing Agreement, which triggered in Reservoir the right to terminate the Agreement, as defined by Paragraph 17.01(b). However, Reservoir had to act on that right by giving notice no later than 90 days after the later of Storch's notice to Reservoir of the petition or Reservoir's otherwise learning that Storch's petition for bankruptcy had been filed.  Reservoir did not do so; it thus did not terminate the Agreement.

In August 2016, the Trustee filed an adversary proceeding in which he sought to consolidate Storch's various companies, including Tuff Jew, with Storch's bankruptcy estate. *Brown v. Tuff Jew Productions LLC*, Adv. No. 16-1421-JKO, (S.D. Fla.)[3].  The Trustee then sought

---

[2] References to docket entries from the Chapter 7 bankruptcy case are designated as "15-20095 Dkt. No. __."

[3] References to docket entries from the adversary proceeding are designated as "16-1421 Dkt. No. __."

the Bankruptcy Court's approval of a settlement agreement in the underlying bankruptcy case, pursuant to which (*i*) Storch agreed to support and consent to the consolidation sought by the Trustee in the related adversary proceeding, (*ii*) Storch agreed to cooperate with the Trustee's investigation of "Potential Claims," including as against MRCI, and (*iii*) the Trustee agreed to reject all pre-petition executory contracts if he was successful in obtaining consolidation.  Dkt. No. 100-61.

The Bankruptcy Court approved this settlement on September 22, 2016 and entered a consent judgment substantively consolidating all of Storch's companies, including Tuff Jew, with Storch's bankruptcy estate.  *See* Dkt. No. 100-63, Consent Final Judgment Substantively Consolidating Tuff Jew Productions LLC, Great Scott Publishing, LLC, Scott Storch Music, LLC, a/k/a Scott Storch Music, Scott Storch Music, and Scotty Kat Music; the "Substantive Consolidation Order".

On November 30, 2017, Storch filed a motion in the underlying bankruptcy case, asking the Bankruptcy Court to issue a "comfort order" deeming pre-petition contracts rejected by operation of law, pursuant to 11 U.S.C. § 365(d)(1).  Dkt. No. 100-67.  Such a comfort order would free Tuff Jew from its obligations under the Publishing Agreement – including, insofar as is relevant here, the obligation to deliver new songs to Reservoir.

MRCI opposed Storch's motion, arguing that the relief he sought could only be obtained, if at all, through another adversary proceeding, and not by motion, because several issues remained to be determined – including whether the Publishing Agreement was executory, whether the consent judgment consolidating Storch's entities with his bankruptcy estate was binding upon MRCI, and the effect of a rejection on MRCI, which, had purchased Tuff Jew's pre-petition writer's share pursuant to the Assignment.  Dkt. No. 100-68.

Following a hearing, the Bankruptcy Court granted Storch's motion and entered the rejection order on December 4, 2017, deeming the Publishing Agreement rejected as a matter of law (the "Rejection Order"). 15-20095 Dkt. Nos. 168, 171.

MRCI moved for partial reconsideration, arguing that *inter alia*, the Rejection Order worked a manifest injustice to MRCI by granting relief without an adversary proceeding, anticipating that Reservoir would use the Rejection Order as a justification for not paying MRCI the writer's share of royalties owed under the Publishing Agreement as assigned to MRCI pursuant to the Assignment. 15-20095 Dkt. No. 173. Following full briefing and a hearing held on February 28, 2018, the Bankruptcy Court denied MRCI's motion for partial reconsideration. 15-20095 Dkt. No. 184.

MRCI appealed both the order deeming the Publishing Agreement rejected and the order denying its motion for reconsideration to the United States District Court for the Southern District of Florida, arguing that the Bankruptcy Court erred by (i) entering the Rejection Order without first analyzing whether the Publishing Agreement is executory, or contains severable non-executory obligations; (ii) determining that an adversary proceeding was not required; and (iii) effectively binding MRCI to the consolidation judgment when MRCI was not given adequate notice of those consolidation proceedings.

The District Court rejected MRCI's appeal on two grounds. First, it determined that the comfort order was not a "final order" within the meaning of 28 U.S.C. § 158(a)(1). Second, "Even assuming the Court was to exercise jurisdiction to consider the merits of the appeal," it deemed MRCI's substantives arguments unpersuasive. In particular, the District Court observed the following about the impact of the Rejection Order:

> How Reservoir intends to use the Rejection Order with respect to payments of the writer's share to MRCI under an assignment made subsequent to and not embodied in the

Publishing Agreement is not an issue that was resolved by entry of the Rejection Order. Nor may it be resolved by this Court in the context of the instant appeal.  As the Bankruptcy Court noted, *there has been no ruling with respect to the effect of the Rejection Order upon Reservoir's obligation to pay MRCI the writer's share. . . .*

Rejection does not embody the contract-vaporizing properties so commonly ascribed to it. *Rejection merely frees the estate from the obligation to perform; it does not make the contract disappear.*  More specifically, rejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.

Indeed, MRCI does not take issue with a purported non-performance by Storch or the consolidated debtor Storch Entities.  Rather, it takes issue with the potential position that Reservoir, a non-debtor, may take with respect to payment obligations to MRCI, another non-debtor.  Therefore, MRCI's appeal is not well-taken.

*Music Royalty Consulting, Inc. v. Scott Storch Music*, LLC, No. 18-CV-60890, 2018 WL 6812943, at *6 (S.D. Fla. Dec. 27, 2018) (alterations, citations, and quotations omitted for clarity; emphasis added). In other words, the Bankruptcy Court left the issue of Reservoir's obligation to pay MRCI for decision in some other forum – such as, in this lawsuit.

### Reservoir stops making payments and providing accountings to MRCI.

On September 30, 2017, MRCI received an accounting statement from Reservoir for the semi-annual period ending on June 30, 2017.  The statement reported $117,754.99 in "total royalties" for that period, and net royalties of $43,253,85 after the deduction of chargeable costs. But Reservoir did not remit *any* payment to MRCI in connection with that statement, nor did Reservoir provide any information to justify the significant deductions taken from the total publishing income for that semi-annual period.

On December 5, 2017, MRCI's counsel, Charles Throckmorton, sent a letter to Reservoir (the "Throckmorton Letter"), demanding that it pay MRCI the full amount of royalties reported in the September 2017 accounting statement and asking for a detailed accounting of all amounts that had been withheld from previous statements:

> On behalf of MRCI, we demand that Reservoir immediately: (1) pay to MRCI all outstanding amounts owed for royalties, including the $117,754.29 figure; and (2) . . . provide MRCI with a full and detailed accounting of any amounts being withheld or deducted from such royalties, or that have been withheld or deducted from previous royalty payments, with a detailed explanation of the legal or contractual basis for any withholdings or deductions.

Throckmorton Letter, Dkt. No 100-82.

Throckmorton sent Reservoir a follow-up letter on January 10, 2018, emphasizing MRCI's position that, in breach of the Publishing Agreement, Reservoir was improperly withholding royalties due to MRCI and failing to provide accounting information.

Reservoir sent MRCI one final accounting statement in April 2018. But it made no payment in connection with that accounting statement. After the April 2018 accounting statement, Reservoir altogether stopped sending MRCI semi-annual accounting statements.

On May 18, 2018, Reservoir finally replied to Throckmorton's two letters. In its response to the Throckmorton Letter and follow-up, Reservoir took the position that Reservoir did not owe any royalties to MRCI for either of two reasons: (1) Reservoir had never consented to the Assignment, or (2) Storch/Tuff Jew's bankruptcy proceedings qualified as an event of default by Storch under the Publishing Agreement, thereby allowing Reservoir to suspend all payments and halt the issuance of accounting statements. For the semi-annual periods ending on June 30, 2018, and December 31, 2018, Reservoir did not provide MRCI with accounting statements or make any payment of royalties.

### D. *Procedural Posture*

On October 16, 2018, MRCI initiated the instant action by filing a complaint asserting eleven causes of action. Dkt. No. 5. Reservoir moved to dismiss the complaint. On April 17, 2019, this court issued a written opinion dismissing with prejudice ten of the eleven counts asserted in the complaint and granting MRCI leave to amend Count 9 so that I could decide whether MRCI

had any viable breach of contract claim in light of the incontestability clause and short statute of limitations in the Publishing Agreement that governs the relationship between the parties. *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt*., Inc., No. 18-CV-9480 (CM) (KNF), 2019 WL 1950137, at *1 (S.D.N.Y. Apr. 17, 2019) (Dkt. No. 48).

On May 21, 2019, MRCI sent a letter to Reservoir reiterating its objections to all accounting statements issued since October 2012, and to Reservoir's refusal to render when due statements and payments for all subsequent semi-annual accounting periods. *See* Dkt. No. 55-25.

One day later, on May 22, 2019, MRCI filed the FAC. Dkt. No. 55. Reservoir moved to dismiss. And then, on October 31, 2019, this court issued its second written opinion in this case, further narrowing the scope of MRCI's surviving cause of action for breach of contract. *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc*., No. 18-CV-9480 (CM) (KNF), 2019 WL 6335261 (S.D.N.Y. Oct. 31, 2019) (Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the First Amended Complaint) (Dkt. No. 69).

Cross motions for summary judgment, with accompanying *Daubert* motions, followed.

On June 4, 2021, MRCI moved for partial summary judgment under Fed. R. Civ. P. 56 for an order (i) granting summary judgment in favor of Plaintiff on the issue of Defendant's liability for breach of contract; and (ii) dismissing Defendant's affirmative defense based on the purported availability of indemnification under relevant contractual provisions. Dkt. No. 86. On the same day, MRCI moved to preclude the expert testimony of Clark Miller Consulting, LLC (Dkt No. 91) and the expert testimony of Barry M. Massarsky (Dkt. No. 94). Also on June 4, 2021, Reservoir moved for summary judgment dismissing the FAC pursuant to Fed. R. Civ. P. 56. Dkt. No 99.

I address the pending motions in turn.

# LEGAL STANDARDS

A. *Motion for Summary judgment*

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  At summary judgment, the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

"Where, as here, there are cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). Once the movant meets its burden, the non-movant may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movant must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

B. *Daubert*

In connection with its Motion for Summary Judgment (Dkt. No. 99) and Opposition to MRCI's Motion for Partial Summary Judgment (Dkt. No. 112), Reservoir has submitted reports

from two purported expert witnesses: Clark Miller of Clark Miller Consulting, LLC, and Barry Massarsky. *See* Dkt. No. 82.

Clark Miller was engaged to provide his expert opinions on music publishing industry customs and practice in connection with the operative agreements in this case. Barry Massarsky was engaged to estimate the dollar amount of lost value to Reservoir's portfolio caused by Tuff Jew's failure to deliver new Storch compositions for the fourth option period of the Publishing Agreement.

Plaintiff MRCI challenges the admissibility of this evidence under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence.

When expert testimony is offered, the district court serves a "gatekeeping" function in determining whether an expert witness really qualifies as one. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"The Second Circuit has 'distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018)).

The party proffering the expert's opinions "has the burden to establish the [Rule 702] admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *In re*

*Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2017)). The court need not "admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In its evaluation, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Ultimately, the *Daubert* standard is a "flexible one," *Daubert*, 509 U.S. at 594, "and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266. District courts have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)). Even if an expert is qualified, the court must still consider whether the probative value of the testimony is "substantially outweighed by a danger of . . . unfair prejudice" or likelihood of confusing or misleading the jury. Fed. R. Evid. 403; *see also United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

## DISCUSSION

Ordinarily the court would first decide the *Daubert* motions before addressing the merits, so as to determine what evidence is "admissible" for the purpose of deciding the motions for summary judgment. That is because "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment . . .. it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

But in this particular case, there are a number of pure questions of law for the court to decide that might (and in fact do) render some of Reservoir's proffered expert testimony irrelevant.

Barry M. Massarsky is Reservoir's "lost value" expert. His testimony is offered to prove that Storch and Tuff Jew's breach of the Publishing Agreement caused Reservoir's portfolio to "lose value." Massarsky opines on the anticipated value of songs that Scott Storch was due to deliver to Reservoir at the time that he rejected the Publishing Agreement, and on how those songs would have lifted the overall market value of Reservoir's music asset portfolio. Massarsky concludes that the lost value to Reservoir's portfolio from the undelivered Storch compositions is $1,344,560. MRCI moves to exclude Massarsky's testimony as irrelevant, arguing, *inter alia*, that the Publishing Agreement on its face does not permit Reservoir to withhold *from MRCI* royalty payments as indemnity for any purported "lost value" caused by Tuff Jew's breach of the Publishing Agreement.

Clark Miller of Clark Miller Consulting, LLC is Reservoir's music publishing industry expert. The expert opinions of Clark Miller are offered to prove – or to at least raise a genuine issue of fact concerning – the following four contentions: (i) Reservoir did not consent to the Assignment; (ii) the Publishing Agreement permitted Reservoir to indefinitely suspend royalty payments otherwise due to MRCI; (iii) MRCI did not provide a specific written objection to the Challenged Statements; and (iv) Reservoir did not cause the damages that MRCI claims to have suffered.

MRCI moves to exclude Miller's testimony, arguing, *inter alia*, that (i) the Letter of Direction unambiguously establishes that Reservoir consented in writing to the Assignment; and (ii) the Publishing Agreement is unambiguous in that it does not permit Reservoir to indefinitely suspend royalty payments due for compositions previously delivered. Since contract construction

is, in the first instance, a question of law for the court, MRCI argues that Miller has nothing to say that the court needs to hear, since it can decide these issues by reading the unambiguous text of the relevant documents.

I agree with MRCI that the court must first consider whether any expert testimony on these topics is warranted, or whether, as a simple matter of construing unambiguous contracts, these issues can be decided without resort to any parol evidence, expert or not.

I thus turn first to the merits of MRCI's motion for partial summary judgment.

## I.   MRCI's Motion for Partial Summary Judgment on the Issue of Liability is GRANTED; Reservoir's Cross-motion for Summary Judgment Dismissing the FAC is DENIED.

MRCI moves for partial summary judgment holding Reservoir liable for breach of the Agreement for failing to pay royalties and make accountings.  Reservoir moves for summary judgment dismissing the breach of contract claim based on Reservoir's failure to make payments and accountings *and* based on the royalty payments made to MRCI in March 2016, September 2016, and March 2017 (the "Challenged Statements").

For the following reasons, MRCI's motion for partial summary judgment is granted and, accordingly, Reservoir's cross motion for summary judgment dismissing MRCI's action as a matter of law is denied.

Under New York law, a breach of contract plaintiff must prove the four following elements: (1) a valid and enforceable agreement; (2) adequate performance by the plaintiff; (3) breach by the defendant; and (4) damages.  *Donohue v. Cuomo*, 980 F.3d 53, 67 (2d Cir. 2020) (internal citation omitted).

In a breach of contract case, "Summary judgment is appropriate if the terms of the contract are unambiguous." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d. Cir. 2011)

(citing *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)).   And, "if the inferences are certain, the question involves only a matter of law and is to be decided by the court." *Riviera Finance of Texas, Inc. v. Capgemini US, LLC*, 511 Fed. Appx. 92, 95 (2d Cir. 2013) (summary order) (quoting *Anderson Clayton & Co. v. Alanthus Corp.*, 91 A.D.2d 985, 985 (2d Dep't 1983)).

I begin with the first element of MRCI's breach of contract claim – the existence of a valid and enforceable contract.

A. *The Publishing Agreement is Valid and Enforceable by MRCI as a Matter of Law.*

The Publishing Agreement is a valid and enforceable contract under New York law. Moreover,  as the assignee of Tuff Jew's rights under the Agreement, MRCI has the power to enforce Reservoir's breach of the Publishing Agreement.

Reservoir first contends that it no longer needed to make accounting or pay royalties because Storch rejected the contract in bankruptcy and stopped performing thereunder. But that dog won't hunt.

The Rejection Order neither extinguished the Publishing Agreement ("vaporized" it, as the Bankruptcy Court put it) nor relieved Reservoir of its obligation to pay MRCI – as Storch's assignee – royalties due and owing on songs Tuff Jew had already delivered to Reservoir and that Reservoir was exploiting. Tuff Jew delivered more than 300 of Storch's compositions to Reservoir prior to Storch (and later by consolidation, Tuff Jew's) bankruptcy.  While Storch's rejection of the Publishing Agreement constituted an event of default and a breach of the Publishing Agreement, the impact of that breach must be determined based on the provisions of the rejected contract – by "what [the contract] means in contract law outside bankruptcy." *Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019).  Moreover, rejection is "forward

looking" and "does not affect the rights and obligations that have already accrued." *In re N.Y. Skyline, Inc.*, 432 B.R. 66, 80 (Bankr. S.D.N.Y. 2010). Rejection of a contract does not extinguish the debtor (or his assignee's) acquired rights, including the right to receive payment for completed performance. *Mission Prod. Holdings*, 139 S. Ct at 1666 (2019) ("rejection . . . cannot rescind rights that the contract previously granted").

Prior to its rejection of the Publishing Agreement in bankruptcy, Tuff Jew performed thereunder by delivering over 300 songs to Reservoir. Tuff Jew's past performance pursuant to the Publishing Agreement vested its right (and, following the assignment, its assignee's right) to receive the writer's share of royalties for those 300 songs; no further performance on its part (or on its assignee's part) was required. As long as those songs are generating royalties – royalties that are being collected by Reservoir – Reservoir is contractually obligated to pay the writer's share of those royalties to their rightful owner, which happens to be MRCI, as Tuff Jew's assignee.

Nothing in the Publishing Agreement as it existed outside the bankruptcy entitled Reservoir to keep the writer's share of royalties that it was continuing to collect. While Tuff Jew's rejection means that Tuff Jew had no further obligation to deliver new songs to Reservoir, various aspects of the Publishing Agreement remained in effect after the bankruptcy: these included Reservoir's obligation to administer the Compositions, collect and pay royalties, make accountings, and the provisions concerning events of default, notice, and termination. *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, No. 18-CIV-9480 (CM) (KNF), 2019 WL 6335261, at *5 (S.D.N.Y. Oct. 31, 2019) (citing *Music Royalty Consulting Inc. v. Scott Storch Music*, LLC, No. 18-CV-60890, 2018 WL 6812943, at *6 (S.D. Fla. Dec. 27, 2018)).

Indeed, if Reservoir had exercised its contractual right to terminate the Publishing Agreement when Storch declared bankruptcy – which, I hasten to add, it did not– Reservoir would

still have been required to continue exploiting Storch's previously delivered songs and collecting and paying the royalties earned thereon to the rightful payee. That is because, upon termination, "Publisher will have no obligations or liabilities. . ..*except for Publisher's obligations, if any, for Compositions delivered prior to that termination.*"  Publishing Agreement, ¶ 17.01(b)(emphasis added).  In other words, the terms of the Publishing Agreement itself make it clear that Reservoir must continue to exploit, account for, and pay out the writer's share of any royalties it collects on all Storch compositions that were delivered prior to the rejection of the contract.

So nothing in the Bankruptcy Court's Rejection Order authorized Reservoir to stop paying royalties on the songs that had already been delivered and that Reservoir has continued to exploit for its own benefit.

> i.   <u>The Assignment is valid as a matter of law.</u>

Next, Reservoir argues that it does not have to continue paying royalties to MRCI because it did not consent to the Assignment.

This argument, too, lacks merit.

There is history to this argument. Reservoir moved to dismiss this action at the pleadings stage for failure to state a claim, arguing that MRCI lacked standing to enforce the Publishing Agreement because Reservoir had not consented to the Assignment in writing, as required by the terms of the Publishing Agreement. The court denied that motion, ruling – based solely on the pleadings and the documents referenced therein – that MRCI had standing to pursue its claim, because it appeared from the face of the documents that the Letter of Direction executed by Storch/Tuff Jew and Reservoir served as Reservoir's written consent to the Assignment.  *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, 2019 WL 6335261, at *5, fn. 3 (S.D.N.Y.

Oct. 31, 2019) (Dkt. No. 69); *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc*., 2019 WL 1950137, at *21 (S.D.N.Y. Apr. 17, 2019) (Dkt. No. 48).

Now that discovery has concluded, Reservoir renews its argument that the Letter of Direction does not constitute its written consent to the Assignment – and it offers expert testimony to buttress its contention.

The anti-assignment provision of the Publishing Agreement provides that the writer (Storch/Tuff Jew) "shall not have the right or power to assign this Agreement or any of [its] rights hereunder, except with the written consent of [Reservoir], not to be unreasonably withheld." Publishing Agreement, ¶ 15.  Tuff Jew (Storch) and MRCI executed the Assignment Agreement on April 13, 2012, and Reservoir and Storch executed the Letter of Direction on June 19, 2012. The Letter of Direction directed Reservoir to "irrevocably and perpetually pay, make, and send to MRCI . . . [a]ll amounts otherwise due [to] me (or any affiliated entities) under the Publishing Agreement (including, without limitation, **all royalties, all advances, and all payments**)."  Letter of Direction at 1 (emphasis in the original).

Significantly for our purposes, the second paragraph of the Letter of Direction explicitly provides that the parties are entering into the Letter of Direction *in order to give effect to the Assignment*:

> This Letter of Direction **is made in connection with the Music Publisher Royalty Assignment dated April 13, 2012 (the "Assignment")** I have entered into with Music Royalty Consulting, Inc. ("MRCI"), under which I have irrevocably and perpetually sold my royalty rights to MRCI."

Letter of Direction (Dkt. No. 55-5), at 1 (emphasis added).

By signing a document that contained this language (and it did), Reservoir indicated in writing that it consented to the Assignment. There is no ambiguity whatsoever on this score. By its terms, the Letter was made "in connection with" the Assignment. The fact that the consent is

embodied in a Letter of Direction, rather than in a separate document called a "consent to assignment," is irrelevant; the Letter of Direction makes it perfectly clear that the only reason the Letter of Direction was being executed was to carry out the provisions of the Assignment. No Assignment, no Letter of Direction.  Given the fact that, under the Publishing Agreement, Reservoir could not unreasonably withhold consent to any Assignment, its explicit written agreement to pay royalties to MRCI pursuant to a Letter of Direction "made in connection with …..the Assignment" can be interpreted in but one way: as consent to the Assignment.

Reservoir's expert, Clark Miller, would testify, if permitted to do so, that in the music industry letters of direction are a mere accommodation that music publishers give to their songwriters, and that such letters of direction do nothing more than authorize and agree to the payment of royalties otherwise due to a songwriter to a third party like MRCI.  Miller Report at 4-5.  That may be true for letters of direction that don't specifically and unambiguously state that they are being made "in connection with" an assignment. But nothing in Mr. Miller's proposed testimony addresses the plain language of this particular letter of direction – language that requires no expert assistance for the court to interpret. Therefore, so much of MRCI's motion to exclude Clark Miller's testimony that addresses his opinion about the effect of the Letter of Direction is granted – not because Mr. Miller lacks expertise, but because evidence that varies the terms of an unambiguous contract is simply not admissible.

Reservoir also points to the language in the Letter of Direction that says MRCI is neither a party nor a third-party beneficiary of that agreement, and that the Letter does not constitute a waiver of any of Reservoir's rights or Tuff Jew's obligations under the Publishing Agreement.

But MRCI is not suing on the Letter of Direction; it is suing for breach of the Publishing Agreement.  As an assignee of Tuff Jew's rights under the Publishing Agreement, MRCI acquired,

*inter alia,* the right to enforce the contract. *Furlong v. Shalala*, 156 F. 3d 384, 392 (2d Cir. 1998). There is simply no question of third-party beneficiary status to worry about, because the Letter of Direction is not the contract on which suit is brought and MRCI has undoubted authority to sue on the Publishing Agreement.

Treating the Letter of Direction as what its plain language says – an agreement made by Reservoir in connection with the Assignment, and so as written consent thereto – does not constitute a waiver of Reservoir's rights under the Publishing Agreement. To the contrary, by executing a Letter of Direction "in connection with the Music Publisher Royalty Assignment," Reservoir was *exercising* one of its rights under the Publishing Agreement – its right to consent to Assignment.  As previously mentioned, Reservoir could not have unreasonably withheld its consent to the Assignment without itself breaching the Publishing Agreement. The fact that it signed an agreement stating that it was made in connection with the Assignment, and then paid out royalties for years without ever once suggesting that it had not consented to the Assignment, indicates that withholding consent would have been unreasonable and its own violation of the Publishing Agreement.

 In any event, even if Reservoir's signing of the Letter of Direction "in connection with" the Assignment did not constitute consent, the lack of consent would not void or invalidate the assignment or eliminate MRCI's right to enforce the assigned contract.

New York law governs the Publishing Agreement, and New York strongly disfavors anti-assignment clauses. Under New York law an assignment that violates an anti-assignment provision is nonetheless enforceable by the assignee, unless the anti-assignment clause "specifically use[s] language to the effect that the assignee receives no rights from an improper assignment or that such assignment is void." *Wheelabrator Techs. of N. Am., Inc. v. Fin. Sec. Assurance of Okla.,*

*Inc.*, No. 88 Civ. 7623, 1990 WL 180552 (S.D.N.Y. Nov. 15, 1990).  The anti-assignment provision of the Publishing Agreement contains no such language. Therefore, with or without Reservoir's written consent, the assignee (MRCI) can exercise the rights that were assigned to it – including the right to collect the writer's share of royalties and enforce the Publishing Agreement. *Citibank, N.A. v. Tele/Res., Inc.*, 724 F.2d 266, 268 (2d Cir. 1983).

If Reservoir truly did not consent to the Assignment, its remedy was to sue the wrongful *assignor* – Tuff Jew/Storch – for breach of the Publishing Agreement, not to withhold payment of royalties from MRCI. The fact that Reservoir did not sue Tuff Jew/Storch for breach, either immediately after the Assignment or in an adversary proceeding during Storch's bankruptcy, is yet even more evidence that the court's interpretation of the unambiguous language in the Letter of Direction – language tying it to the Assignment – is correct.

> ii.    Reservoir both ratified the Letter of Direction by its conduct AND waived its
>        right to repudiate that agreement.

Next, Reservoir argues that the Letter of Direction is voidable as a matter of law because Reservoir did not execute the agreement voluntarily.  Instead, Reservoir asserts that it was somehow forced to enter the Letter of Direction by Storch – acting in concert with "infamous convicted felon and rapper, Suge Knight," who, together with Storch, pressured Reservoir to sign the Letter of Direction with threats of physical violence.  *See* Reservoir's Memorandum of Law in Support of its Cross-Motion for Summary Judgment ("Res. Mot.") (Dkt. No. 101) at 22.

Reservoir argues that Storch and Suge Knight sought to pressure Reservoir to sign the Letter of Direction by sending cryptic messages to Lafargue saying "we will be meeting soon," and that someone was "watching" Reservoir's office.  Res. Mot. at 23.  According to Reservoir, at least one threatening call from Knight to Lafargue was made from MRCI's office.  *Id.*  Therefore,

according to Reservoir, any "consent" it may have given to the Assignment is void as a matter of law.

This melodrama – mentioned for the first time in Reservoir's cross motion for summary judgment – does not warrant dismissal of MRCI's claim or summary judgment in Reservoir's favor. For Reservoir's revelation comes far too late. It is undisputed and indisputable that Reservoir has both repeatedly ratified the Letter of Direction and waived any right it might have had to dispute the existence of a valid and enforceable Letter of Direction on grounds of duress.

A party claiming duress must act promptly to repudiate the contract at issue or that party will be deemed to have waived its right to do so. *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633 (2d Cir. 1982) (collecting cases). Far from repudiating the Letter of Direction, with its approval of the Assignment, as the product of duress, Reservoir continued to perform thereunder by paying royalties to MRCI for years – including throughout the Stoch/Tuff Jew bankruptcy litigation – without ever once suggesting that it had executed the Letter of Direction under duress, from Suge Knight or anyone else. Reservoir does not so much as suggest any reason why it could not come forward with this claim until June of 2021, which is when the word "duress" was first mentioned. It has thus waived its right to assert a defense of duress to the Letter of Direction.

Moreover, Reservoir is estopped from making the argument. At the motion to dismiss stage of this litigation Reservoir explicitly represented that it "does not dispute the existence of valid and enforceable *contracts*" (plural in original, *see* Dkt. No. 30 at 13). Since there are only two contracts at issue – the Publishing Agreement and the Letter of Direction – Reservoir's use of the plural "contracts" constitutes an admission that both contracts are valid and enforceable. Reservoir even distinguished certain authorities cited by MRCI on the ground that they involved a "bona fide dispute as to the existence of any contract," whereas this case involves "no such dispute." *Id.*

Reservoir has also ratified the Letter of Direction.

A party ratifies a contract entered into under duress "by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011) (internal citations omitted). In this case, Reservoir clearly ratified the Letter of Direction by performing its obligations under the agreement – to direct payments of the writer's share to MRCI – for many years, without ever once suggesting duress. This argument, concocted years after the document was executed, comes far too late to be of any benefit to Reservoir.

### iii. The Rejection Order did not affect MRCI's power to enforce the Publishing Agreement.

Finally, Reservoir argues that summary judgment dismissing the complaint is warranted because MRCI lost any right it had to enforce the Publishing Agreement when the Bankruptcy Court entered the Rejection Order. According to Reservoir, MRCI "claims to stand in Storch's shoes as [his] purported assignee, and a debtor – like Storch – that rejects a contract lacks the power to enforce it post-rejection." Res. Mot. at 23.

Again, Reservoir is wrong.

As the Bankruptcy Court specifically held that the debtor's rejection of a contract in bankruptcy neither extinguished ("vaporized") the contract nor cancelled the rights and obligations of *non-debtor* parties to that contract. Storch/Tuff Jew's rejection of the Publishing Agreement in connection with Storch/Tuff Jew's Chapter 7 bankruptcy did not terminate MRCI's rights (or obligations) under the Publishing Agreement. It terminated Storch's and Tuff Jew's obligations thereunder – for example, it ended any obligation that Storch might have to deliver new songs to

31

Reservoir. But it did not terminate Reservoir's accrued obligations – including specifically the obligation to pay royalties for the 300 songs that had already been delivered and for which Reservoir was collecting royalties. And it did not affect MRCI's rights as assignee at all.  MRCI, as the assignee to the Publishing Agreement, has the power to enforce the Agreement notwithstanding Storch's rejection by operation of bankruptcy.

*B.   Reservoir Breached the Publishing Agreement and Caused Damage to MRCI by Failing to Remit Royalty Payments and Make Accountings to MRCI.*

 With all of Reservoir's defenses to the validity of the Assignment and MRCI's right to enforce it demolished, we move to the second, third and fourth element of a breach of contract claim.

Reservoir does not contest any of them.  It does not dispute that, prior to his bankruptcy and rejection of the Publishing Agreement,  Storch delivered over 300 songs to Reservoir for its exploitation. Reservoir does not dispute that it has continued to exploit those songs and to collect royalties on Storch's song portfolio. And Reservoir admits that it stopped paying any portion of those royalties to MRCI after April 2017 and stopped providing MRCI with accountings after March 2018.  It thus admits performance, breach, and damages to MRCI.

However, Reservoir argues that it was not obligated to remit payments and make accountings for a variety of reasons. None of them is persuasive.

> i.   Reservoir did not elect to suspend its obligations in accordance with the express terms of the Publishing Agreement, so it cannot now claim that it has the right to withhold payments as part of a suspension.

Reservoir first argues that it was not required to make payments because Storch/Tuff Jew were themselves in default under the Agreement, thereby allowing Reservoir to suspend all of its

obligations thereunder – including the obligation to make payments and accountings to MRCI. *See* Defendant Reservoir's Memorandum of Law in Opposition to MRCI's Motion ("Def. Opp."), Dkt. No. 101, at 14.  According to Reservoir, it was permitted to suspend all obligations pursuant to Paragraph 17.01 because at least two events of default occurred: (1) in June of 2015 when Storch/Tuff Jew initially petitioned for bankruptcy; and (2) in November 2017 when Storch/Tuff Jew moved the Bankruptcy Court to reject the Agreement. *Id*. "Consequently, Reservoir's obligations to MRCI indefinitely and permanently ceased beginning with the September 2015 accounting period," so "what is left of MRCI's breach of contract claim fails." *Id*.

Unfortunately for Reservoir, its argument is contradicted by the terms of the Publishing Agreement itself.

Storch's declaration of bankruptcy was unquestionably an "event of default" under the express terms of  Paragraph 17.02 of the  Publishing Agreement. So was his rejection of the Agreement. Two options were available to Reservoir in "the event of the occurrence of an event of default."  First Reservoir had the right to suspend its own obligations under the Agreement, at least while the event of default continued:

> In the event of the occurrence of an event of default as described in paragraphs 17.02(a)(iv) and 17.02(a)(v) below, Publisher shall have the right to: (i) suspend all of Publisher's obligations under this Agreement, including, without limitation, Publisher's obligation to account to you and to make payments, said payments including, without limitation, Advances and royalties; and (ii) suspend the running of the Term for the duration of such event of contingency.

Publishing Agreement ¶ 17.01(a).

Suspension is, by its terms, a temporary remedy; Black's Law Dictionary defines "suspension" as the "act of *temporarily* delaying, interrupting, or terminating") (emphasis added).

*See* Black's Law Dictionary (11th ed. 2019). There is no such thing as a permanent suspension, which is what Reservoir is claiming now.

Alternatively, Reservoir had the right to *terminate* the Agreement on a going forward basis, while continuing to account for and pay royalties collected in respect of compositions already delivered.:

> Publisher shall have the right to terminate this Agreement (whether or not you have commenced curing the default before such termination), in which event Publisher will have no obligations or liabilities to you under this Agreement except for Publisher's obligations, if any, for Compositions delivered prior to that termination. If Publisher so terminates this Agreement, you will pay Publisher, on demand, an amount equal to the total (even if paid in installments) of any unrecouped Advances paid pursuant to this Agreement in connection with any Compositions not delivered to Publisher. Publisher will continue to have all rights, in accordance with the terms hereof, in all of the Compositions delivered prior to termination of this Agreement.

*Id.*, ¶ 17.01(b).

Termination was specifically contemplated as a going forward remedy; it did not permit Reservoir to cease paying royalties that it was continuing to collect to whoever was entitled to the writer's share (in this case, to MRCI).

In order to exercise its right to elect either of these remedies, Reservoir was required to give written notice of its election to MRCI, as assignee, not later than ninety days after the later of "notice to Reservoir of the occurrence of such event [of default] or [Reservoir's] otherwise learning that such an event has occurred." *Id*.

Reservoir learned of Storch's bankruptcy shortly after it occurred; it participated in various proceedings in the bankruptcy court. But there is not the slightest evidence that Reservoir ever provided anyone – Storch/Tuff Jew or MRCI – with timely written notice that it was electing either to suspend its obligations under the Publishing Agreement temporarily or to terminate the Agreement. There is no evidence that it sent written notice of its decision to suspend its obligations

under the Agreement within 90 days after it became aware that Storch had declared bankruptcy, which occurred in June of 2015.  And there is no evidence that it sent written notice of a decision to suspend its obligations under the Agreement within 90 days after Storch/Tuff Jew took steps to reject the Publishing Agreement. The last possible event of default occurred in November of 2017, when Storch/Tuff Jew petitioned the Bankruptcy Court to reject the Agreement.  But as late as April of 2018, Reservoir had not explained why it was withholding royalties or indicated that it was exercising its right to suspend obligations pursuant to Paragraph 17.01(a) of the Publishing Agreement.  In fact, it sent MRCI an accounting statement in March 2018 – an action inconsistent with a suspension of its obligations pursuant to Section 17.01(a).

Not until May 2018 – three years after the bankruptcy began, and six months after Storch and Tuff Jew filed their rejection petition – did Reservoir notify MRCI that it had "suspended" royalties and accountings. Because that was more than ninety days after it learned of the last possible event of default, Reservoir failed to comply with the terms of the suspension provision. This renders its belated effort to rely on some "suspension" of its obligations under the Publishing Agreement entirely misguided.

Time limited options like the option to suspend are "ineffective if . . . not given within the time specified." *USA Network v. Jones Intercable, Inc*., 729 F. Supp. 304, 310 (S.D.N.Y. 1990) ("failure to exercise the option within thirty days made . . . notice of termination ineffective, as a matter of law").  And MRCI is correct that the notice requirement set forth in Paragraph 17.01 is unambiguous and *mandatory*. Paragraph 17.01 provides, "If Publisher elects to exercise any of the options specified below, then Publisher shall give you notice of same not later than ninety (90) days after the later of your notice to Publisher of the occurrence of such event or Publisher's otherwise learning that such an event has occurred." Publishing Agreement, ¶ 17.

Reservoir argues that the Publishing Agreement was automatically rejected by operation of the Bankruptcy Code as of August 3, 2015, because the Trustee did not assume the Publishing Agreement within sixty days of the June 3, 2015, bankruptcy petition date.   According to Reservoir, its obligations to MRCI indefinitely and permanently ceased beginning with the September 2015 accounting period, which, but for the rejection, would have been the next time that Reservoir was due to pay royalties and account to MRCI.

But Reservoir's own behavior between June 2015 and at least March 2018 gives the lie to this argument; Reservoir did not suspend its obligations but continued to comply with them.

Having failed to comply with the 90-day notice requirement of the Publishing Agreement, Reservoir cannot now contend that it "suspended" its obligations and is not bound to comply with them.

> ii.   <u>Because Storch/Tuff Jew permanently rejected their obligations under the Publishing Agreement, suspension is not a remedy available to Reservoir.</u>

MRCI argues that suspension pursuant to ¶ 17.01(a) – which is, by its terms, a temporary remedy, not a permanent one – was not available to Reservoir once Storch and Tuff Jew permanently rejected their obligations under the Publishing Agreement. When that happened, their default became permanent and incurable – at which point, MRCI insists,  Reservoir's only remedy was termination of the Agreement pursuant to Paragraph 17.01(b).  But of course termination left Reservoir liable for payment of royalties it was collecting for compositions already delivered.  In the event of termination, Reservoir was relieved from its obligations and liabilities "except for" its obligations "for Compositions delivered prior to that termination."   Publishing Agreement, ¶ 17.01(b).

Although Reservoir's failure to exercise either remedy in accordance with the terms of the Publishing Agreement makes it unnecessary to address this argument, I agree with MRCI that, at

least from and after Storch and Tuff Jew's rejection of the Publishing Agreement, suspension was not an available remedy – only termination was.

Suspension  of the Publisher's obligations (including its obligation to pay royalties) is not available for every event of default.  It is only available only upon the occurrence of the events of default as set forth in Paragraph 17.02(a)(iv) and (a)(v).  Those events of default occur: (1) upon any "attempt to assign this Agreement…" (¶ 17.02(a)(iv)); and (2) if "You or the Writer refuse, neglect, fail, fail, breach, are unable to, or otherwise do not comply with any of your or Writer's other respective material obligations hereunder, including without limitation, Writer's exclusivity" (¶ 17.02(a)(v)).

We have already disposed of any suggestion that the Assignment to MRCI constituted an event of default under the Publishing Agreement, because Reservoir consented to the Assignment by executing a Letter of Direction "made in connection" therewith. But Reservoir argues that Storch/Tuff Jew's rejection of the Agreement falls within the meaning of the phrase "refuse, neglect, fail, breach, are unable to, of otherwise do not comply with any of your or Writer's other respective material obligations hereunder, including, without limitation, Writer's exclusivity." Rejection of the agreement resulted in Storch's termination of his exclusive publishing arrangement with Reservoir and eliminated for all time any obligation on Storch/Tuff Jew's part to comply with any of their material obligations under the Agreement. Res. Mot. 13.

According to Reservoir, Paragraph 17.01 of the Publishing Agreement thus permitted Reservoir to "suspend all of [its] obligations under the Publishing Agreement," including any obligation to "make payments" or to account to MRCI.  *Id*. (quoting the Publishing Agreement, ¶ 17.01(a).

But suspension is *temporary* and is therefore only available in situations where the triggering breach is temporary and can be remedied.  At the very least, the rejection of the contract in bankruptcy, if not the filing itself, was an uncurable and *irrevocable* event of default, which logically cannot be remedied. Reservoir did not have the option to "suspend" its obligations until the event of default was cured when the event of default was an incurable breach.

### iii. General principles of contract law do not permit Reservoir to indefinitely suspend payments and accountings to MRCI.

Finally, even if it is not excused from performance by the "unambiguous terms of the Publishing Agreement," Reservoir argues that performance is nonetheless excused under general principles of New York contract law, in that rejection was both a material breach and a repudiation of the Publishing Agreement --  either of which excuses Reservoir's performance.

Reservoir's failure to perform might in fact be excused if  its contractual obligation to pay royalties for songs previously delivered were dependent on whether Tuff Jew continued to perform its obligation to deliver to Reservoir new songs.  But that is simply not the case.

Paragraph 17.01 of the Agreement specifically provides that certain events of default – *e.g.*, if the songwriter files for bankruptcy – allow Reservoir to terminate the Agreement but still require that Reservoir pay the writer's share on the royalties it collects on the Tuff Jew songs already delivered. The Publishing Agreement makes clear that Tuff Jew's obligation to deliver songs is independent of Reservoir's obligations to pay a percentage of the royalties collected on previously delivered songs.  As clearly articulated by my colleague Judge Kaplan, "If two promises are independent, breach of one does not excuse performance of the other." *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 147 (S.D.N.Y. 2004).  Reservoir "does not point to any evidence of the parties' intent to make these provisions dependent so that" one party's breach would excuse another party from performance.  *Id*.

An "important aspect in determining whether promises are independent is whether part of the consideration for the transaction can be allocated to each promise or covenant." *Coleman Co. v. Hlebanja*, 1997 WL 13189, at *7 (S.D.N.Y. Jan. 15, 1997).  Under the Publishing Agreement, royalties are measured on a song-by-song basis, down to the payment (*see* Publishing Agreement, ¶ 7), whereas delivery of future songs is compensated with pre-determined advances (*see* Publishing Agreement, ¶ 6).  So consideration for the obligation to deliver future songs is separate and distinct from consideration for songs already delivered – royalty payments.

The question of whether covenants are to be held dependent or independent of each other is to be determined by the intentions or the parties *and* "by the application of common sense." *Pfizer, Inc.*, 348 F. Supp. 2d at 147.  Common sense dictates the conclusion that Tuff Jew did not intend for Reservoir to be allowed to keep the writer's share of royalties for songs that were already in Reservoir's portfolio – royalties paid for the exploitation of compositions already delivered, Tuff Jew assigned the copyrights to Reservoir's predecessor in exchange for promises to collect and pay royalties.  Reservoir continues to license the copyrights and collect royalties on Tuff Jew's songs while simultaneously insisting that Tuff Jew's breach entitles Reservoir to terminate that Agreement and to keep all of the royalty payments for itself.

Common sense counsels against that result.

So general principles of contract law do not excuse Reservoir from fulfilling its surviving obligations pursuant to the Publishing Agreement.

Reservoir  has failed to raise any defense that would excuse its breach. There is no question of fact for a jury to decide pertaining to that issue.

Therefore, MRCI's motion for partial summary judgment holding Reservoir liable for breach of contract for failure to pay royalties and provide it with periodic accountings is granted,

with damages to be determined at trial. Reservoir's cross-motion for summary judgment dismissing MRCI's breach of contract for failure to pay royalties and make accountings is correspondingly denied.

This also disposes of the *Dauber*t motion addressed to Clark Miller's testimony about Reservoir's purported right to suspend making royalty payments to MRCI. That testimony, like his testimony about letters of direction, is irrelevant. The unambiguous terms of the contracts, the undisputed facts, and settled principles of law make the result inevitable.

C. *Whether MRCI complied with the "Specific Written Objection" Requirement under the Publishing Agreement with Respect to the Challenged Statements Presents a Triable Question of Fact; MRCI's Daubert Motion to Exclude the Testimony of Clark Miller is accordingly DENIED in part.*

Reservoir moves for summary judgement dismissing so much of MRCI's breach of contract claim as challenged the validity of the March 2016, September 2016, and March 2017 accounting statements – the Challenged Statements – on the ground that MRCI failed to comply with Paragraph 8(a) of the Publishing Agreement, which required the party entitled to an accounting to make "specific written objections" to those statements.

According to Reservoir, the requirement that a party submit a "specific written objection" is common in the music publishing industry and "is understood to require that an objection state the specific account statement that is being objected to, as well as the basis for the objection." Res. Mot. at 23-24.  Reservoir reasons that the Throckmorton Letter does not satisfy Paragraph 8(a) of the Publishing Agreement because it fails to (1) identify which account statements were being objected to; (2) state the basis for the objection; (3) be specific enough to identify the problem; or (4) "provide anything for Reservoir to deny the validity of." *Id.* at 24-25.  Reservoir argues that MRCI's demand that Reservoir "account for" and "explain" the deductions conflates an objection,

which is governed by Paragraph 8(a), with an audit, which is governed separately by Paragraph 8(b).

For those reasons, Reservoir moves for summary judgment dismissing the breach of contract claim as to the Challenged Statements.

MRCI opposes Reservoir's motion; it argues that there is at the very least ambiguity about what a specific written objection consists of.  I agree that there is a triable issue of fact concerning what the "specific written objection" requirement requires. The term is not self-explanatory. Therefore, Reservoir's motion for summary judgment on this issue is denied .

The evidence does not demonstrate that there is a fixed and invariable use of the phrase "specific written objection" understood within the music industry. In fact, Reservoir's President, Rell Lafargue, denied that "specific written objection" has any standard meaning within the music publishing industry. *See* Dkt 106-80: Ex. 89, 55:23–56:6.  When asked an email would satisfy the requirement, Lafargue said "Sometimes. . .. it depends. Most contracts these days I think actually address that." *Id*. 56:14-18.

In short, whatever the expert says, Reservoir's own President does not assign a universally understood meaning to the specific written objection requirement.  So I cannot decide, as a matter of law, that the Throckmorton Letter fails to satisfy the "specific written objection" requirement. That is a job for the trier of fact.  Whether a written objection like the Throckmorton Letter satisfies a contractual "specificity requirement is a material issue of fact that would be inappropriate for the Court to determine on summary judgment." *Allman v. UMG Recordings*, 530 F. Supp. 2d 602, 606 (S.D.N.Y. 2008).

Moreover, Plaintiff is correct that, under extraordinary circumstances, a plaintiff may equitably estop a defendant from asserting a time limitation defense. *Dillman v. Combustion Eng'g, Inc.*, 784 F.2d 57, 60 (2d Cir.1986).

Here, MRCI argues that because the Challenged Statements are "misleading," and because Reservoir actively thwarted MRCI's audit rights, there is at least a fact dispute as to whether the specific written objection requirement, if not satisfied by the Throckmorton Letter, should preclude MRCI's claims as a matter of equity. MRCI's argument is that its objection could not have been made with more specificity without an audit of those statements, which Reservoir refused to authorize. Like the interpretation of the ambiguous specific written objection requirement, "Whether equitable estoppel applies in a given case is ultimately a question of fact." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).

Reservoir's cross-motion for summary judgment dismissing MRCI's breach of contract claim as to the Challenged Statements for failure to timely deliver specific written objections is denied. The jury will decide whether the Throckmorton Letter satisfies the Publishing Agreement's "specific written objection" requirement as to the Challenged Statements. And if he is qualified and reliable – which I will address below – Reservoir's music publishing industry expert Clark Miller may opine on the industry meaning and understanding of such a "specific written objection" requirement.

## II. MRCI's Motion for Summary Judgment Dismissing Reservoir's Affirmative Defense Based on Indemnification is GRANTED; the *Daubert* Motion to Exclude the Expert Opinion of Barry M. Massarsky is GRANTED.

Reservoir represents that it intends to introduce at trial an affirmation defense based on indemnification. If permitted by the court, Reservoir will argue that, pursuant to the indemnification provision of the Publishing Agreement, it was permitted to make deductions from

the net royalties owed to MRCI on a bi-annual basis as indemnity payments to which it was entitled to due to Storch/Tuff Jew's rejection and breach of the Publishing Agreement. And while Reservoir is not seeking damages in this case (it brings no counterclaims), it intends to argue that the "lost value" to Reservoir's composition portfolio caused by Tuff Jew's failure to perform its obligation to deliver new compositions under the Agreement be deducted from any amount of damages awarded to MRCI.

MRCI moves for summary judgment dismissing Reservoir's affirmative defense based on indemnification, arguing that, as a matter of law, Reservoir may not withhold royalties as indemnity for "lost value" damages under Paragraph 13 of the Publishing Agreement.  MRCI Mot. at 21.  Specifically, MRCI argues that Paragraph 13 of the Publishing Agreement does not provide for indemnification in disputes between the parties to the Agreement, and that any damages arising from Tuff Jew's rejection of the Publishing Agreement were discharged in the bankruptcy case.

Reservoir opposes MRCI's motion to dismiss Reservoir's indemnification defense, arguing that it has the right to set off its damages against any payment obligation to MRCI, contractually and as a matter of law.

Reservoir asserts that the Publishing Agreement specifically indemnified Reservoir against Tuff Jew's breach of the Publishing Agreement, that Tuff Jew/Storch's bankruptcy discharge does not benefit MRCI, and that, aside from contractual indemnification, Reservoir has the independent right to recoup and set off its damages against any obligation to MRCI.

Although the parties make numerous arguments in connection with this motion, there is a simple reason why MRCI's motion for summary judgment dismissing this affirmative defense must be granted: MRCI did not assume any of the liabilities or obligations of Tuff Jew and Storch under the Publishing Agreement, including the obligation to indemnify.

The Publishing Agreement does of course contain an indemnity provision, pursuant to which *Tuff Jew* agreed to "indemnify, save and hold [Reservoir] . . . harmless of and from any and all liability, loss, damage, cost or expense (including legal expenses and reasonable attorneys' fees) arising out of or connected with any breach by [Tuff Jew] and/or [Storch] of the terms of this Agreement or any third-party claim which is inconsistent with any of the warranties or representation made by [Tuff Jew] and/or [Storch] in this Agreement."  Publishing Agreement, ¶ 13(a).

But nothing in the Assignment Agreement suggests that MRCI ever assumed any of Tuff Jew's liabilities or obligations under the Publishing Agreement. Tuff Jew assigned to MRCI *only* its rights under the Publishing Agreement to receive accounting statements and to be paid corresponding royalty payments, and the right to enforce those rights. There was no such assumptions of liabilities on MRCI's part – in fact, Tuff Jew and Storch agreed to indemnify MRCI against claims asserted by any party (including Reservoir) by reason of the assignment. Assignment Agreement, ¶ 19.

The assignment of rights under an agreement does not constitute an automatic assumption of liabilities and obligations pursuant to that agreement.  The Assignment Agreement is governed by California law (Assignment Agreement, ¶ 15) and, under California law, the assignment of one party's rights under an agreement does not automatically constitute an assumption of liabilities thereunder.  Indeed, the "rule is that the mere assignment of rights under an executory contract does not cast upon the assignee the obligations imposed by the contract upon the assignor." *Recorded Picture Co. v. Nelson Ent., Inc.*, 53 Cal. App. 4th 350, 362 (1997), *as modified on denial of reh'g* (Apr. 3, 1997).

The Publishing Agreement, on the other hand, is governed by New York law. *See* Publishing Agreement, ¶ 23.  But New York law mirrors California law in this instance; under New York law, "absent an agreement to the contrary, the mere assignment of a contract is an assignment of the rights in the contract and not of the assignor's duties and liabilities incurred prior to the assignment."  *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 494 (S.D.N.Y. 2011).  "The mere assignment of a bilateral executory contract may not be interpreted as a promise by the assignee to assignor to assume the performance of the assignor's duties, so as to have the effect of creating a new liability on the part of the assignee to the other party to the contract assigned." *J. Kagan et al. v. K-Tel Entertainment, Inc.*, 172 A.D.2d 375, 377 (1st Dep't 1991); *see also TMS Ent. Ltd. v. Madison Green Ent. Sales, Inc.*, No. 03 CIV. 0517 (GBD), 2005 WL 476663, at *4 (S.D.N.Y. Feb. 28, 2005) ("In the absence of express assumption of duties, the assignee incurs no obligation") (quoting *Contemporary Mission, Inc. v. Famous Music Corporation*, 557 F.2d 918, 924 (2d Cir.1977)) (an assignment "involves the transfer of rights" and is different from a delegation, which  "involves the appointment of another to perform one's duties").

If the Assignment Agreement's silence were not enough (and it is) to absolve MRCI of any responsibility for any liability owed to Reservoir by Storch/Tuff Jew pursuant to the Publishing Agreement, the Letter of Direction makes it abundantly clear that Tuff Jew/Storch did not assign any of its obligations and liabilities to MRCI as part of the Assignment.  *See* Letter of Direction at 2 ("The Letter of Direction is not a waiver of any of [Reservoir's] rights or *Tuff Jew's obligations* under the Publishing Agreement") (emphasis added).

The fact that MRCI never assumed any of Storch's or Tuff Jew's liabilities makes any other argument about the scope of the indemnification provision or the impact of the bankruptcy

irrelevant.  But, for reasons unknown to the court, MRCI failed to brief this argument in connection with its motion for partial summary judgment.

Accordingly, on April 5, 2022, the court issued a notice to counsel (*see* Dkt. No. 133) and invited the parties to file short supplemental briefs taking a position on this very issue. The court posed the following question: Did MRCI assume the indemnification obligation of Tuff Jew and Storch under the Publishing Agreement and, assuming not, why shouldn't the motion for summary judgment dismissing Reservoir's indemnification defense be granted?

MRCI of course agreed with the court's determination that MRCI did not automatically assume Tuff Jew's obligations and liabilities by way of the Assignment (*see* Dkt. No. 135), stating that the court's argument was "implicit" in its papers.[4]

Reservoir responded by arguing that, the usual rule notwithstanding, (1) under the California Code of Civil Procedure, "MRCI assumed the indemnity obligations by accepting the benefits of the Publishing Agreement"; (2) MRCI's "course of performance shows that it consented to acquiring Storch's royalties net of Storch's indemnity obligations to Reservoir"; and (3) "MRCI cannot stand in a better position than Storch, and thus took assignment of the Writer's Share subject to Reservoir's right of setoff and recoupment." Dkt. No. 134 at 1-2, 4.

None of Reservoir's arguments is persuasive.

***First,*** Reservoir argues that the California Code of Civil Procedure (the "CCP") modifies the common law rule that, absent express consent, a contract assignee does not assume the contractual obligations of the assignor.  Reservoir points to CCP § 1589, pursuant to which, "A

---

[4] There is no such thing as an "implicit" argument – especially a dispositive one. But I cannot agree that anything about non-assumption was "implicit" in MRCI's briefs. The court cannot understand why MRCI did not simply say, "We did not assume any of Tuff Jew's obligations under the Publishing Agreement," rather than arguing a number of what turn out to be irrelevant points.

voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting."

It is quite true that § 1589 can, in some instances, serve to modify the usual rule. But it does not eliminate the usual rule. In fact, § 1589 has been applied by California courts almost exclusively in the context of attorney's fees. *See Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (App. 1 Dist. 2016) 201 Cal. Rptr. 3d 806, 247 Cal. App. 4th 117 ("an assignee's acceptance of the benefits of a contract containing a fee clause, by bringing suit, constitutes an implied assumption of the attorney fee obligations").

And while Section 1589 of the CCP has been applied in other contexts as well, an assignee's voluntary acceptance of the benefits of a contract "*may"* (not "does") obligate the assignee to assume its obligations. The default rule in California remains that an assignment of rights does not imply an assumption of the assignor's liabilities to some third party. *Id.* This is especially true when the facts indicate that no such assumption was intended.

In this case, the facts indicate overwhelmingly and indisputably that no such assumption was intended. The Letter of Direction stated in no uncertain terms that Tuff Jew (and Stoch) remained responsible for their obligations under the Agreement. And that is completely understandable – MRCI, which is in the business of purchasing music-publishing royalty income from musical artists, is not a composer of music and was in no position to assume Tuff Jew's contractual obligation to deliver new songs to Reservoir, the publisher.

A brief review of the authorities cited by Reservoir reveals how very different our facts are from the facts in those cases.

For example, *Auto Fin. Solutions v. Credit Acceptance Corp*., No. 30-2019-01067991-CU-CO-CJC, 2021 Cal. Super. LEXIS 18506 (July 21, 2021) involved a car dealership's sale of a vehicle to a customer.

Typically, when a car dealership sells a vehicle to a customer, the dealership allows the customer to pay for the vehicle by way of a finance agreement with the car dealership itself. The finance agreement between the car dealership and the customer for the purchase of the vehicle is memorialized in a Retail Installment Sales Contract, or a "RISC." A typical RISC provides for installment payments to be made to the dealership over time by the purchaser of the vehicle. A car dealership can sell and assign an executed RISC to a third-party company that pays the dealership in exchange for the assignment of rights to be the creditor listed on the RISC. When a dealership assigns its rights pursuant to a RISC, California law requires that the car dealership register the vehicle and transfer title indicating that the third-party creditor is the "legal owner," and that the customer purchaser of the car is the "registered owner." When the customer finishes paying off the vehicle, he or she becomes both legal and registered owner.

The car dealership in *Auto Fin. Solutions* (assignor) assigned a RISC to a third-party creditor (assignee creditor) in connection with the sale of a Ford vehicle to a customer. But the assignor dealership owed money to yet another creditor (UCC creditor), which had recorded a Uniform Commercial Code ("UCC") security interest (a lien) in the dealership's inventory – including the Ford. The UCC creditor had actual possession of the physical title documents for the Ford.

The UCC creditor sued the assignee creditor, claiming that the assignee was obligated to pay for a release of any claim to title to the Ford. The assignee creditor argued that the assignment was not made subject to the lien, and that it had no obligation to obtain the title by paying off the

creditor.  But the *Auto Fin. Solutions* court concluded (on a preliminary basis)[5] that the assignee creditor had necessarily assumed the registration-related obligations imposed on the legal owner of a vehicle by California law – including the obligation to pay whoever was holding the title in order to procure the title so the car could be registered. Ordinarily the law would have imposed that obligation on the car dealership (the assignor) – but the dealership no longer had the car and so could not do what the law required. Someone had to do what the law required, and the court concluded that the assignee creditor, as the holder of legal title to the car, necessarily assumed those obligations.

In this case, by contrast, Reservoir points to no California law that requires the assignee of royalty payments under a Publishing Agreement assume responsibility for anything. And the documents signed by the parties indicate that no one expected MRCI to assume Tuff Jew's/Storch's contractual obligations. That being so, benefits and liabilities are simply a matter of agreement between the parties to a contract – not an artifact of state law.  So, *Auto Finance* is in inapposite as precedent.

In *VFW v. City of El Paso De Robles*, 62 Cal. App. 4th 1077, 1080-82 (1998), the court held that the City of El Paso De Robles was obligated, pursuant to yet another California law, the Municipal and Military Veterans Code, Chapter 2., Cal. Code § 1262, to maintain a veterans memorial building that it had purchased from the County pursuant. The City argued  that it had assumed no such obligation, because it purchased the property from the county free and clear of any obligation to maintain, repair, or replace the building, and because the text of the Code

---

[5] I note that *Auto Fin. Solutions* is a tentative decision pursuant to California Rule of Court 3.1590(a). This tentative decision remains subject to a party's objection under California Rule of Court 3.1590(g).

provided only that "any county" may provide memorials and meeting places for veterans.[6] *Id*. at 1080.

Nonetheless, the court found for the group of veteran plaintiffs, holding that, "As a general rule, the grantee of a quitclaim deed takes subject to all *equities* that could have been asserted against the grantor." (emphasis added). The City could not avoid the mandates of the Military and Veteran's Code by arguing that it had not affirmatively agreed  to maintain the building; such a result, the court held, would have been inequitable, and was inconsistent with the Code's clear intent to make sure that buildings dedicated to veterans were maintained, whether that owner was the county or a city – an intent memorialized in the last sentence of the statute, which provides that title to any property jointly held by both a county and a city "may at any time be conveyed by either of the joint owners to the other without consideration other than to carry out the purposes of this section." These words in the statute made it crystal clear that a city that ended up with title to such a property would be required "to provide, maintain, or provide and maintain" a veterans memorial building.

Once again, as was the case in *Auto Finance*, a California state law imposed obligations for which someone had to be responsible.

Reservoir points to no such law, code, or principle of equity that would impose a similar obligation in this case.

Finally, *Enter. Leasing Corp. v. Shugart Corp*., 231 Cal. App. 3d 737, 745 (1991) is just as easily distinguished.  In that case, the plaintiff lessor agreed to rent a computer system and

---

[6] Military and Veterans Code section 1262 provides that, "Any county may provide, maintain or provide and maintain buildings, memorial halls, meeting places, memorial parks, or recreation centers for the use or benefit of one or more veterans' associations. For these purposes the board of supervisors of any county may: . . . . Join with any incorporated city in the county in the accomplishment of the above purposes and to that end hold jointly with such city all property acquired, and expend money in conjunction with such city in accomplishing the above purposes. Title to any property jointly so acquired by a county and a city may at any time be conveyed by either of the joint owners to the other without consideration other than to carry out the purposes of this section."

related equipment to the lessee. Shortly thereafter, the lessee sold and assigned its business to a third-party assignee by executing an asset purchase agreement.  In the asset purchase agreement, the assignee did not expressly assume the lease.  But the assignee used the computer equipment, and it made 15 monthly payments to the plaintiff lessor for such use.  Eventually, the assignee started withholding monthly payment and failed to return the equipment when the lease expired after 60 months.  The plaintiff lessor sued the assignee for breach of the lease agreement. The court held that the assignee had assumed the obligations of the lease –  even though the assignee never entered an agreement with the lessor of the computer equipment –  because, "where an assignee takes over a going business, his intention to assume the obligations of a contract relating to the business may be found from his acquiescence in the terms of the contract." *Id*. (quoting *Walker v. Phillips* (1962) 205 Cal. App.2d 26, 32 (22 Cal. Rptr. 727)).  The fact that the purchaser of the business used and paid for the equipment was, of course, powerful evidence that it had in fact acquiesced in and so assumed the terms of the lease.

This is not a case in which MRCI took over Tuff Jew's going business. Storch remained the songwriter who was obligated, under the Publishing Agreement, to deliver new works to his publisher, Reservoir.  MRCI simply obtained the right to payment of royalties that would otherwise have gone to Storch. Nothing in that situation suggests "intention to assume the obligations of a contract relating to the business" of Tuff Jew. And indeed, as I have already noted, the documents relating to the Assignment make it perfectly clear that Reservoir continued to look to Storch and Tuff Jew to perform their obligations under the Publishing Agreement; it expressly disclaimed reliance on MRCI to perform those contractual obligations.

Finally, none of the cases relied on by Reservoir involves a *partial* assignment of a right under a contract. Reservoir cannot and does not argue that MRCI assumed *all* of Storch's

obligations under the Publishing Agreement when Tuff Jew/Storch assigned to it the right to be paid the writer's share of royalties.  For example, Reservoir does not argue that MRCI assumed the obligation to deliver original songs in Storch's stead.  Instead, Reservoir cherry picks among Tuff Jew's various obligations, urging that MRCI must have assumed those that are to Reservoir's advantage (such as Storch's obligation to indemnify Reservoir) But absolutely nothing in the Assignment Agreement identifies any specific obligation that MRCI allegedly assumed. That being so, nothing was assumed.

In sum, the cases cited by Reservoir do not support its contention that the acceptance of benefits under a contract automatically constitutes an assumption of the assignor's obligations and liabilities thereunder, or that California has abandoned its default rule that assignment without more does not impose assumption on the assignee.

At best, the cases support that notion that an assignee will be found to have assumed obligations (1) where the law requires it, or (2) where there is evidence that a party intended to assume. That is just not the case here; there is no evidence whatever that MRCI ever intended to assume any of Storch's obligations under the Publishing Agreement.  All the evidence is to the contrary.

**Second**, MRCI did not "ratify" Reservoir's practice of deducting indemnity from the writer's share by its course of performance. Reservoir asserts that MRCI failed to object to its practice of "deducting amounts, including legal fees, from the royalties based on the indemnity." Dkt. No. 134 at 3. But ratification is defined as, "Confirmation and acceptance of a previous act, thereby making the act valid from the moment it was done." *See* Black's Law Dictionary 1289 (8th ed. 2004).  MRCI neither confirmed nor accepted Reservoir's practice of "self-indemnifying" by deducting indemnity from the writer's share it paid to MRCI.  In fact, MRCI had no idea that

Reservoir was taking deductions in order to satisfy Tuff Jew's obligation to indemnify it against Tuff Jew's breach. MRCI did not know why deductions were being made; that is why MRCI's lawyer asked for an accounting of those royalty payments – an accounting that was never in fact made to MRCI.  One cannot "ratify" what was does not know, and it is undisputed that Reservoir never once told MRCI, through all those years, that it was deducting money from the writer's share pursuant to the indemnification clause in the Publishing Agreement.  Furthermore, the deductions began years before Tuff Jew and Storch breached the Publishing Agreement by declaring bankruptcy, which means they could not have been taken pursuant to any indemnification agreement.

      *Third,*  MRCI did not take the Assignment of the writer's share subject to Reservoir's purported "right to setoff and recoupment." *See* Dkt. No.  134 at 4.  Reservoir asserts that the right of setoff  "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." (quoting *Citizens Bank of Md. v. Strumpf*, 116 U.S. 16 (1995)).  But that argument only works if MRCI owes Reservoir money. In fact, MRCI does not owe Reservoir any money.  MRCI never agreed to indemnify Reservoir and assumed no other obligations under the Publishing Agreement.

      So Reservoir has no basis for invoking offset.

      Reservoir argues that its right to setoff is codified in N.Y. Debt. & Cred. Law. § 151, which provides "that a debtor (like Reservoir) has the right to 'set off and apply against any indebtedness, whether matured or unmatured' any mutual amounts owing from the debtor to a creditor (like Storch/MRCI) upon the creditor's bankruptcy."  But only Storch/Tuff Jew ever agreed to indemnify Reservoir, so only Storch and Tuff Jew could possibly have been responsible to indemnify Reservoir for anything. Storch and Tuff Jew declared bankruptcy and rejected the

Publishing Agreement, and their obligation to indemnify was eliminated.  The fact that Reservoir failed to file a claim against the consolidated bankruptcy estate seeking indemnification from Storch and Tuff Jew does not entitle Reservoir to set off what it believes to be its losses by deducting anything from the writer's share of royalties – which are owed to  MRCI without any offset – under the guise of indemnification.

Because Reservoir's arguments are entirely lacking in merit, the usual rule applies: MRCI did not assume Tuff Jew and Storch's obligations under the Publishing Agreement, including specifically their obligation to indemnify Reservoir for any "loss, damage, cost or expense (including legal expenses and reasonable attorneys' fees) arising out of or connected with any breach by [Tuff Jew] and/or [Storch] of the terms of this Agreement." Publishing Agreement, ¶ 13(a).

Therefore, MRCI is entitled to summary judgment dismissing Reservoir's indemnification defense as a matter of law.

Because the indemnification defense is being dismissed as a matter of law, MRCI's *Daubert* motion to exclude the expert testimony of Barry M. Massarsky must also be granted. Mr. Massarsky's testimony is relevant only to the indemnification defense, not to any surviving issue in this case.  As a result, his testimony is irrelevant.  There is no reason for him to testify at trial, and he will not be permitted to do so.

### III.    MRCI's *Daubert* Motion to Exclude the Expert Opinion of Clark Miller, LLC is GRANTED in part and DENIED in part.

Plaintiff MRCI moves under *Daubert* and Fed. R. Evid. 702 to exclude the Expert Report of Clark Miller Consulting LLC (Dkt. No. 82-2) (the "Miller Report") from consideration in connection with the pending motions to dismiss, and to preclude Clark Miller Consulting, LLC ("Clark Miller" or "Miller") from testifying at trial.

Reservoir offers Clark Miller Consulting, LLC as a music industry expert to testify about music industry custom and practice relevant to the interpretation of the contracts governing this dispute (the Publishing Agreement, the Assignment, and Letter of Direction), and to opine on the propriety of the various actions taken by Reservoir and MRCI regarding Storch's royalty stream. Specifically, Defendant Reservoir engaged Miller to provide his expert opinion on (i) industry custom and practice with respect to letters of direction in general and the Letter of Direction at issue in this case; (ii) Reservoir's suspension of the payment of royalties to MRCI; and (iii) MRCI's failure to object to the Challenged Statements rendered by Reservoir with sufficient particularity. *See* Miller Report, 1.

Clark Miller reaches the following conclusions: that (i) the Letter of Direction was purely an accommodation Reservoir afforded to Tuff Jew and is limited to paying royalties to MRCI that are otherwise due to Tuff Jew; (ii) it is standard for music publishers like Reservoir to suspend paying royalties to songwriters or their payees in the event that a songwriter materially breaches a publishing agreement, and that Paragraph 17.02 of the Publishing Agreement "appears to codify this industry practice"; and (iii) the language in the Agreement requiring a "specific written objection" is understood in the industry to require that an objection must reference the account statements that is being objected to. *Id*.

As should be obvious from the rulings set forth above, much of Miller's testimony is inadmissible.   Specifically, his expert opinions that (i) Reservoir did not consent to the Assignment; and (ii) Storch's rejection of the Publishing Agreement permitted Reservoir to cease making payments to MRCI[7] are both inadmissible.   Not only is no expert opinion needed to testify

---

[7] In support of his opinion that Storch's rejection permitted Reservoir to cease making royalty payments to MRCI, Miller argues that MRCI is pursuing claims against Reservoir only because, due to MRCI's own failure to bargain for protections in the Assignment Agreement, MRCI lacks recourse against Storch and Tuff Jew. But that is absurd; MRCI has had the right to enforce its receipt of royalty payments from Reservoir since those rights were assigned to

about whether Reservoir consented to the Assignment, but this court has concluded, as a matter of law, that it did in fact consent to the Assignment. Similarly, the court has held, again as a matter of law, that Storch's rejection of the Publishing Agreement did not allow reservoir to continue to exploit his previously-delivered compositions and keep the writer's share of the royalty for itself.

As a result, Miller's testimony that rejection in bankruptcy allowed reservoir to cease making payments to MRCI is also inadmissible.

Additionally, MRCI's objection to Miller's testimony on the ground that he improperly opines on the parties' states of mind, motives, and intentions is sound.  For example, Miller opinions in his report that, "Despite *its belief* that Storch was not being forthright, MRCI appears to have only bargained for two protections in the Assignment," (Miller Report, 6) (emphasis added) and that, "I would have thought that, in a situation like this, a tolling agreement *would have been the first thing on the mind of a lender like MRCI*, with experience in the music industry." (Miller Report, 9) (emphasis added).

Such things lie outside the bounds of permissible expert testimony. *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (quoting *In re Rezulin Products Liab. Litig.*, 309 F.Supp.2d 531, 540 (S.D.N.Y.2004)). Questions about the parties' knowledge and intentions are classic questions of fact for the jury.  *Id.*  So even if expert testimony about these two issues were not contrary to legal rulings made by the court, so much of Miller's testimony as opined on state of mind, motive and intent would have to be excluded.

What is left of Clark Miller's proposed expert opinion is the meaning of the "specific written objection" requirement.

---

it in 2012. Miller's "opinions" about what MRCI should have bargained for are excluded from evidence because his views are inconsistent with rulings this court is making as a matter of law.

Clark Miller started his consulting firm, Clark Miller Consulting, LLC, in 2018 to service clients in the media space.  Miller's clients include performance rights societies, music publishers, digital and back-office service providers, and various investors in music and other content.  Before that, Miller worked in the legal and business affairs department of large, reputable publishing companies for over 25 years.  From 2014 until 2018, he worked as the Executive Vice President of North America Operations of Warner Chappell Music.

MRCI moves to exclude the expert opinion of Clark Miller in its entirety on the grounds that he offers improper legal opinions; he fails to provide adequate support for his opinions; and he impermissibly opines on the parties' states of mind, motives, and intentions.

MRCI does not challenge Miller's qualifications as an expert on music publishing industry custom and practice, and with good reason.  Miller's decades of experience at the highest levels of the music industry undoubtedly render him a qualified to offer opinions on industry customs and practice.  But, as discussed below, he is not qualified to offer legal opinions or to base certain ultimate conclusions on a legion opinion that differs from the law as the court will charge the jury.

MRCI's challenges to these aspects of Miller's expert opinions primarily go to weight and not admissibility.  MRCI takes issue with that facts that Miller provides no "technical basis for his opinion," and that he "fails to provide a testable" explanation for his conclusions.  But Rule 702 permits an expert witness to testify based on that expert's personal, specialized experiences and observations.  *See* Fed. R. Evid. 702(a) ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's . . .. specialized knowledge will help the tier of fact to understand the evidence or to determine a fact at issue").

Miller has extensive experience in the music industry, rendering his opinions on industry custom and practice sufficiently reliable. "Courts have often that found experts who testify as to an industry custom based on their experience in an industry satisfy" the *Daubert* reliability requirement. *Intelligent Digital Sys., LLC v. Beazley Ins. Co*., No. 12-CV-1209 (ADS) (GRB), 2015 WL 3915586, at \*24 (E.D.N.Y. June 23, 2015); *see also Ling Nan Zheng v. Liberty Apparel Co*., 556 F.Supp.2d 284, 292 (S.D.N.Y. 2008) (same).

Therefore, Mr. Miller may testify as to the industry meaning of the term "specific written objection." If this case is tried, I expect that MRCI will vigorously cross-examine Mr. Miller and argue to the jury that Mr. Miller's opinions are entitled to little weight.

## CONCLUSION

MRCI's motion for partial summary judgment on its breach of contract claim as to liability and dismissing Reservoir's affirmative defense based on indemnification is GRANTED. Reservoir's cross-motion for summary judgment on MRCI's breach of contract claim is DENIED. MRCI's *Daubert* motion to exclude the expert opinion of Barry M. Massarsky is GRANTED. MRCI's *Daubert* motion to exclude the expert opinion of Clark Miller, LLC is GRANTED in part and DENIED in part.

This decision will temporarily be filed under seal. In accordance with this court's prior order temporarily sealing certain documents referencing material that the parties deem to be confidential (Dkt. No. 45), the parties have ten days from this decision (*i.e*., until April 28, 2022), to identify any portion of the moving papers, corresponding exhibits, and this decision that should remain under seal. Pages and paragraphs in this opinion and in briefs must be identified with specificity, as must exhibits or portions thereof, and each designation must be accompanied by an explanation of why sealing should be permitted in light of the presumption of public access. After

I have received any submissions, I will make the necessary rulings and this opinion will be publicly filed, either in its entirety or in appropriately redacted form.  The parties should be aware that, as of the present moment, I see no reason to redact anything from this opinion.

This constitutes the opinion and order of the court. It is a written opinion.  The Clerk is directed to close the motions at Docket Numbers 86, 91, 94, and 99.

Dated: April 18, 2022

_____

U.S.D.J.

BY EMAIL TO ALL COUNSEL